STATE of Iowa, Appellee,

v.

Sherman Paul HOGREFE, Appellant.

No. 95–1155.

Supreme Court of Iowa.

Nov. 20, 1996.

Rehearing Denied Dec. 17, 1996.

Richard O. McConville of Coppola, Sandre & McConville, P.C., Des Moines; for appellant.

Thomas J. Miller, Attorney General, Martha E. Boesen, Assistant Attorney General, and Paul L. Martin, County Attorney, for appellee.

Considered by HARRIS, P.J., and CARTER, LAVORATO, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

Sherman Paul Hogrefe appeals from conviction and sentence for theft by deception. *See* Iowa Code §§ 714.1(3), 714.2(1), and 714.3 (1993). He raises several issues. Because one issue is dispositive of the case, we address it only. That issue is whether there was sufficient evidence to submit the marshalling instruction on theft by deception. Because we conclude there was not sufficient evidence to submit the instruction, we reverse and remand for a new trial.

I. *Background Facts and Proceedings.*

Hogrefe is a 1986 graduate of South Dakota State where he majored in agribusiness. Following graduation, Hogrefe worked for several years as a sales representative for American Cyanamid selling chemicals. During this time, Hogrefe came into contact with Richard Houge, Jim Dunbar, and Kim Pleggenkuhle. At the times material to this case, Houge and Dunbar were employees of North Iowa Cooperative Elevator (NICE). Houge was the general manager of the elevator, and Dunbar was its chemical and agronomy manager. Pleggenkuhle was the owner and man-

ager of Midwest Soya International, Inc. (Midwest), a grain elevator in Clear Lake.

Hogrefe left American Cyanamid in January 1991. He started farming about 1600 to 1800 acres. He also owned two small businesses—a commodities trading office and a land development company.

In September 1991 Hogrefe approached Pleggenkuhle about a "no lose" business proposition. Hogrefe convinced Pleggenkuhle to have Midwest advance Hogrefe $425,000 for the purchase and resale of Pursuit, a herbicide manufactured by American Cyanamid. For this advance, Midwest was to profit $40,000 by December 1, 1991, the beginning of Midwest's new fiscal year. Because of Hogrefe's past sales experience with American Cyanamid, Pleggenkuhle believed Hogrefe would be able to sell the herbicide.

Midwest had an ongoing business relationship with Pattison Grain, a grain elevator in Fayette. Pleggenkuhle approached Pattison Grain about advancing $250,000 toward the $425,000. Pleggenkuhle convinced Pattison Grain to make the advance because both considered Hogrefe—a farmer—a potential customer.

On September 25 Hogrefe and his wife executed a promissory note to Midwest for $425,000 together with a security interest on Hogrefe's crops and a mortgage on his house. Hogrefe received the $425,000 from Midwest through payments on September 25 and 26. Pleggenkule insisted that the deal be completed by December 1 because Midwest would close its books by that date and the company needed money to purchase grain for the next year.

December 1 came and went, but Midwest saw no money, herbicide, or profits. About this time, Pleggenkuhle began pressing Hogrefe for the money. Hogrefe testified he had purchased and resold chemicals with the $425,000 but could not remember what had happened to the sales proceeds.

Instead of using the proceeds from the proposed sale of chemicals purchased with Midwest's money, Hogrefe arranged for payment by other means. These other means are the subject of this appeal.

Around mid-December Hogrefe approached Dunbar about purchasing Pursuit, but that sale fell through. Instead, Hogrefe ended up agreeing to buy 500 gallons of Pursuit from NICE. Dunbar determined the sales price, and Hogrefe wrote four checks to NICE for $262,220. These checks were meant as payment for the 500 gallons of Pursuit. All four checks were dated December 22, 1991. Hogrefe and Dunbar understood that the checks were to be cashed at different times.

NICE presented the four checks for payment at some point. The checks, however, were returned for insufficient funds. The record contains no mention of when or where the checks were presented.

On December 24—two days after Hogrefe wrote the four checks to NICE as payment for the 500 gallons of Pursuit—Houge wrote Hogrefe a check from the NICE account for $230,000. On that same day, Hogrefe signed over this check to Midwest as part payment on the $425,000 advance.

At this point, NICE had yet to order the 500 gallons of Pursuit.

Houge testified that he specifically ordered Dunbar not to order the Pursuit until Hogrefe repaid the $230,000. Dunbar apparently ordered the 500 gallons of Pursuit on December 30. At trial, Dunbar claimed that Houge had authorized the order.

On December 26 Houge called Hogrefe into NICE's Portland facility. Hogrefe came as requested and wrote three checks to NICE for $231,500. Two checks were dated December 28 and one was dated December 29. Houge was to hold all three checks until Hogrefe approved their deposit.

Various explanations were given at trial for the $230,000 check Houge gave Hogrefe. Hogrefe testified the $230,000 was an "advance" on a contract for the sale of 35,000 bushels of Hogrefe's grain to NICE. This transaction was evidenced by a written contract Hogrefe prepared at the December 24 meeting between Houge and himself. Hogrefe did not sign the contract, Houge testified, because it was for a large quantity and delivery was to occur the next month. Houge testified the contract "wasn't some-

thing that the producer was going to forget." Houge further testified that when he turned over the $230,000 check to Hogrefe, he was unaware Midwest had a lien on Hogrefe's grain.

Later in his testimony, Hogrefe gave a second explanation for the $230,000 check: the check was meant as prepayment for the Pursuit that Hogrefe was to deliver to NICE. NICE's bookkeeper testified by deposition that (1) Houge told a secretary that the $230,000 was an advance purchase of Pursuit, and (2) the check was entered into NICE's ledger as prepayment for chemicals.

The bookkeeper testified to a third explanation. Houge told her the $230,000 check was written to Hogrefe "because Sherm needed some money that day."

Hogrefe gave a fourth explanation: the $230,000 check was a gift. Hogrefe denied anything more than that he and Houge discussed a grain sale and that Houge made an offer. At one point, however, Hogrefe did refer to the money as "borrowed."

Hogrefe denied having an obligation to repay the $230,000 until he wrote the three checks for $231,500 to NICE on December 26. He characterizes these checks as a favor in appreciation of a previous gift. He denied he gave the checks in payment of an obligation.

Houge, on the other hand, testified Hogrefe's three checks for $231,500 to NICE were to correct his "mistake" for giving Hogrefe the $230,000 check. Houge explained the additional $1500 as "interest" on the $230,000.

As mentioned, Dunbar ordered the 500 gallons of Pursuit on December 30. American Cyanamid through its distributor United Purchasers Association (UPA)—a chemical distributor operating out of Minnesota— shipped the 500 gallons of Pursuit to NICE on December 31. The Pursuit arrived on January 2, 1992, at NICE's Plymouth facility. Hogrefe picked up the Pursuit that day.

The Plymouth facility is not the normal winter delivery site for freezable chemicals such as Pursuit. Houge was at the Portland facility when the Pursuit arrived. Dunbar was at the Plymouth facility that day to receive the Pursuit. No one prepared a warehouse receipt until several days later and after NICE's bookkeeper became aware of Hogrefe's January 2 pickup.

On January 2—the same day he picked up the 500 gallons of Pursuit—Hogrefe delivered the Pursuit to Pattison Grain. This delivery apparently satisfied any outstanding obligation Hogrefe had on the $425,000 advance from Midwest and Pattison Grain to Hogrefe.

On January 6 American Cyanamid billed NICE for the 500 gallons of Pursuit at a price of $275,000. Hogrefe told Houge to cash the three checks totaling $231,500 as payment for the 500 gallons of Pursuit. Houge added UPA as payee on the three checks from Hogrefe totaling $231,500, endorsed the checks as payment for the 500 gallons of Pursuit, and told UPA to deposit them. On January 8 the checks were returned for insufficient funds.

About mid-January after the three checks were returned for insufficient funds, Hogrefe promised Houge that he would bring to NICE 1000 gallons of Pursuit in "exchange for the money and Pursuit he had obtained from NICE."

On Friday, January 24, Dunbar drove Hogrefe to a truck rental agency so Hogrefe could rent a truck to deliver the 1000 gallons of Pursuit to NICE. On the way, Hogrefe called an insurance agent with questions about insuring the truck and Pursuit for $600,000. The agent told Hogrefe she would call him back with some answers. Later the agent tried unsuccessfully to reach Hogrefe and give him answers to the questions he posed.

After picking up the truck, Dunbar and Hogrefe drove to NICE's Portland facility. When they arrived, Hogrefe told Dunbar he was not feeling well and would pick up the truck after a doctor's appointment he had scheduled. Hogrefe never returned to pick up the truck. Instead he found someone to take the truck from the locked Portland facility (Dunbar had given Hogrefe the keys to the facility) so that the truck and its supposed cargo appeared to have been stolen. In truth, Hogrefe had never purchased any

Pursuit to replace the money and Pursuit he had obtained.

The next evening—Saturday—Hogrefe called Dunbar and told him the 1000 gallons of Pursuit was at NICE's Portland facility. On Monday morning, January 27, Dunbar picked Hogrefe up at the latter's home so they could unload the Pursuit. When they got to NICE's Portland facility, the pair discovered that the truck and chemicals were gone. The two then drove to the insurance company Hogrefe had called earlier and told the agent that the truck and cargo had been stolen. The agent told the two that the truck and cargo were not insured through her company and suggested that they call the sheriff. She also told them to call NICE and have NICE report the "loss" to its insurance carrier.

Hogrefe reported the contrived theft to the sheriff, who investigated and secured an admission from Hogrefe that the theft was a fraud. Hogrefe pleaded guilty to a charge of filing a false report. Hogrefe neither made any payment on the seven checks he had written to NICE nor did he ever return any Pursuit to the elevator.

In September 1992 Hogrefe filed for bankruptcy. Several months later NICE objected to the discharge of Hogrefe's debt to NICE.

The State charged Hogrefe with one count of first-degree theft by deception and one count of conspiracy. *See* Iowa Code §§ 714.1(3), 714.2(1), 714.3, and 706.1. A jury convicted Hogrefe of the theft charge and acquitted him on the conspiracy charge. The district court sentenced Hogrefe to an indeterminate sentence not to exceed ten years *See* Iowa Code §§ 714.2(1), 902.3, 902.9(3).

II. *Sufficiency of the Evidence to Support Submission of the Marshalling Instruction on Theft by Deception.*

As mentioned, the jury convicted Hogrefe of theft by deception. Iowa Code section 714.1(3) states that a person commits theft when that person "[o]btains the labor or services of another, or a transfer of possession, control, or ownership of the property of

another, or the beneficial use of property of another by deception." Iowa Code section 702.9(5) defines deception as, among other things, "[p]romising payment, the delivery of goods, or other performances which the actor does not intend to perform or knows the actor will not be able to perform."

The district court gave the following marshalling instruction on theft by deception:

In Count I of the Trial Information, theft by deception in the first degree, the State must prove all of the following elements of theft:

1. On or about the 24th day of December, 1991, the defendant received cash and/or agricultural chemicals from [NICE] *in exchange for a series of checks* written to [NICE].

2. The defendant deceived [NICE] by promising payment, the delivery of goods, or other performance which the defendant did not intend to perform or the defendant knew he would not be able to perform.

3. The defendant obtained possession, control or ownership of cash or property from [NICE] by deception.

(Emphasis added.)

Hogrefe contends the district court erred in giving this instruction. The crux of Hogrefe's objection to this instruction is that it allows the jury to consider (1) the four checks he gave NICE relative to Hogrefe's purchase of 500 gallons of Pursuit and (2) the three checks he gave NICE relative to the $230,000 advance. In support of his contention, Hogrefe relies heavily on one of our recent theft by check cases where we said:

Our holdings establish that when there is an understanding between the parties that a check is not cashable [no money in the account to cover the check] at the time it is received, but will be made so at some time in the future, the representations made are only promises, there is no deception and, thus, no criminal liability results under section 714.1(6) [theft by check]. If, however, the surrounding circumstances at the time a check is given, including the statements made, are representations that sufficient funds exist at the time to cover the check, then criminal liability may re-

sult even though a check is postdated. Our focus remains on the representations made at the time a check is delivered.

Under our approach, a postdate is only *evidence* that a check was intended as a promise of future payment and does not alone relieve a defendant of criminal responsibility. It must also be established that both parties understood that a check was not cashable when delivered before criminal liability is precluded as a matter of law. Where both parties do not understand that a postdated check is not cashable until a future date, the question of guilt should be submitted to the fact finder. It is then up to the fact finder to determine whether the maker deceived the party receiving the check by presenting a check that the maker knew, at the time of delivery, would not be paid when presented to the bank it was drawn upon.

*State v. McFadden,* 467 N.W.2d 578, 581 (Iowa 1991) (citation omitted). We pointed out in *McFadden* that the gist of the theft by check offense is obtaining something of value through deception. *Id.* If the victim knows the check is worthless when the victim takes it, the victim has not been deceived. *Id.* In these circumstances, criminal liability for theft by check is precluded as a matter of law. *Id.*

Hogrefe points out that at the time all seven checks were written, he told Houge there were not sufficient funds in his account to cover the checks and that Houge was to hold the checks until told to deposit them. Thus, Hogrefe concludes, the district court—based on our decision in *McFadden*—should not have instructed the jury to consider the seven checks on the question of deception.

Hogrefe makes an additional argument as to the three checks he gave Houge several days following the $230,000 advance. Houge asked for these checks, Hogrefe argues, because Houge had second thoughts about advancing him the $230,000. Hogrefe's point is that he had already obtained the $230,000 *before* he had written the three checks. In short, NICE through Houge never advanced the $230,000 in reliance on the three checks. Or, in the words of paragraph one of the marshalling instruction, Hogrefe never "re-

ceived cash ... from NICE in exchange" for the three checks. For this additional reason, Hogrefe insists the district court should not have instructed the jury to consider these three checks because the checks were not evidence of deception.

The State responds that Hogrefe's arguments raise "nothing more than a red herring." The State points out that Hogrefe is relying on our use of the term "deception" in the context of a theft by check offense, whereas here we are dealing with a theft by deception offense. The State relies heavily on our holding in *State v. West,* 252 N.W.2d 457 (Iowa 1977), dealing with "theft by false pretenses," the historical precursor to "theft by deception." As the State implies, Hogrefe simply wants us to define deception in theft by deception cases the same way we define deception in our theft by check cases.

 Hogrefe's contentions raise a sufficiency of the evidence objection to the marshalling instruction. Our rule is that parties to a lawsuit are entitled to have their legal theories submitted to the jury if such theories are supported by substantial evidence. *Sonnek v. Warren,* 522 N.W.2d 45, 47 (Iowa 1994). Evidence is substantial to support submission of an instruction to the jury when a reasonable mind would accept the evidence as adequate to reach a conclusion. *Coker v. Abell–Howe Co.,* 491 N.W.2d 143, 150 (Iowa 1992). In determining whether there is substantial evidence to support submission of an instruction to the jury, we view the evidence in the light most favorable to the party requesting the instruction. *Id.*

Because there is a substantial overlap between "theft by deception" and "theft by check," we think a discussion of the two offenses and their treatment of checks would help in our analysis of the issue Hogrefe raises.

 A. *Historical background.* We have never interpreted theft by deception. Some historical background, therefore, is helpful. Iowa Code section 714.1(3), theft by deception, replaced sections criminalizing theft by "false pretenses." 1976 Iowa Acts ch. 1245, § 1401 (codified at Iowa Code supp. § 714.1(3) (1977)); 1976 Iowa Acts ch. 1245,

§ 526 (repealing Iowa Code ch. 713, false pretenses, frauds, and other cheats §§ 713.1–713.43). In enacting section 714.1(3), theft by deception, the legislature—for the most part—followed the lead of the American Law Institute Model Penal Code (1980) [hereinafter Model Penal Code] in its definition of theft by deception. So the Model Penal Code commentaries on the definition are persuasive authority in our interpretation of our own theft by deception statute.

As stated, Iowa Code section 714.1(3) provides that a person commits theft when that person "obtains the labor or services of another, or a transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another by deception." Iowa Code § 714.1(3).

Iowa Code section 702.9(5) defines deception as "[p]romising payment, the delivery of goods, or other performance which the actor does not intend to perform or knows that the actor will not be able to perform." Iowa Code § 702.9(5). This same section goes on to say "[f]ailure to perform, standing alone, is not evidence that the actor did not intend to perform." Iowa Code § 702.9(5).

Iowa Code section 713.1 (1975) defined "false pretense" as follows:

> If any person designedly and by false pretense . . . and with intent to defraud, obtain from another any money, goods, or other property . . . he shall be imprisoned. . . .

The change in language from theft by "false pretenses" to theft by "deception" clarified the legislature's intent to criminalize every instance of a person obtaining another person's property by deception. Before, in other jurisdictions, convictions for theft by false pretenses were challenged if the deception involved a promise to pay in the future. For example, in *Chaplin v. United States*, 157 F.2d 697, 698–99 (D.C.Cir.1946), the court held that a liquor dealer who asked for money to buy liquor tax stamps and promised to repay the cash advanced, could not be convicted of theft by false pretenses. The defendant used only a small portion of the advance to purchase stamps and never repaid any amount. *Chaplin*, 157 F.2d at 697–98. The defendant's promises were held to "re-late to a future transaction" and, therefore, did not and could not constitute a "false *pretense* [which] must relate to a past event or existing fact." *Id.* at 698 (emphasis added).

Many federal and state courts, however, rejected the *Chaplin* rationale that the promise of future payment made without the intent to fulfill this promise could not be a false pretense. *See, e.g., United States v. Grayson*, 166 F.2d 863, 866 (2d Cir.1948); *United States v. Johnson*, 284 F.Supp. 273, 279 (W.D.Mo.1968); *People v. Ashley*, 42 Cal.2d 246, 262, 267 P.2d 271, 281 (1954) ("[A] promise made without intention to perform is a misrepresentation of a state of mind, and thus a misrepresentation of existing fact, and is a false pretense. . . .").

We clearly rejected the *Chaplin* rationale in *West*—a false pretenses case. *West*, 252 N.W.2d 457. We stated the issue this way: "Does a promise to perform an act in the future, made with no intent to perform, constitute a misrepresentation under the false pretenses statute, § 713.1, The Code?" *Id.* at 459. We concluded it did. *Id.* at 461. We held that the promisor's intention at the time of promising, as well as the promisor's ability to fulfill the promise, are facts which may constitute a false pretense. *Id.*

In *West*, we overruled turn of the century precedent which implied that promises of future payment could not be a false pretense. *Id.* ("We . . . hereby reject any previous position . . . taken by this court that a promise to perform a future act, made with the intent not to perform, is not sufficient to support a charge of cheating by false pretenses."). The false promises rationale embraced in *West* was carried over to the definition of deception in section 702.9(5) (Deception consists of knowingly "[p]romising payment, the delivery of goods, or other performances which the actor does not intend to perform or knows that the actor will not be able to perform."). *Accord* Model Penal Code § 223.3 cmt. 3(b) (false promises are part of definition of "deception" in theft by deception offense).

Theft by check and theft by deception clearly overlap. A person who obtains an-

other's property by writing a bad check could be charged with theft by check and theft by deception involving a check. This was the original scenario in *State v. Rojas–Cardona,* 503 N.W.2d 591, 593 (Iowa 1993). Our cases have never explained the reason for this apparent overlap.

■ When the two statutes are compared, however, the reason for some overlap is apparent. The two charges differ only as to how intent at the time of promising may be proved by the State, that is, what inferences are acceptable. Under the theft by deception statute and the definition of deception, promised payment evidenced by a check may constitute theft if the promisor never intended to pay. But, the "[f]ailure to perform, standing alone, is not evidence that the actor did not intend to perform." Iowa Code § 702.9(5). The mere fact of nonpayment of a check is not sufficient. Something more must be shown to prove criminal intent.

Checks may be returned for a variety of reasons; not all of those reasons necessarily deserve criminal punishment. The court must make an inquiry as to all the surrounding facts to determine the intent with which the check (or promise) was made.

Section 714.1(6) (theft by check), on the other hand, sets out several specific, statutorily-defined circumstances that may, standing alone, imply the criminal intent of the promisor as a check writer. If the check was refused by the drawee because the account was closed, or if the drawee refuses payment because of a lack of funds on deposit and the maker is given the prescribed notice, then the fact finder may infer that the maker knew it would not be paid when the check was written. Iowa Code § 714.1(6).

■ Theft by check may be proven by the drawee's nonpayment for certain, limited reasons. Theft by deception requires, on the other hand, a more thorough inquiry of all the facts and circumstances surrounding the defendant's promise or other form of deception recognized in section 702.9 (definition of deception). When, as here, the deception alleged relates to the defendant's promise, the inquiry centers on (1) whether the defendant intended to perform or (2) whether the

defendant knew he or she would not be able to perform. Proof as to either prong depends in most cases on circumstantial evidence.

The theft by check statute establishes a clear scheme for dealing with a common means of theft (bad checks) with potentially difficult questions of proof. Theft by deception is meant as a catch-all crime to encompass the full and ever changing varieties of deception. Factual scenarios may overlap, but the legal schemes in which they are situated are complementary rather than redundant.

Our case law surrounding these two complementary statutes appears contradictory on the question whether a promise to pay in the future can be the basis of a theft charge. As we mentioned, *West* clearly rejected the proposition that a promise to pay in the future could not be the basis for a false pretenses offense. *West,* 252 N.W.2d at 461. *West* also overruled a line of cases from the late nineteenth to early twentieth century. *Id.* at 460–61. *West* did not, however, address a 1934 decision of this court, namely, *State v. Doudna,* 226 Iowa 351, 284 N.W. 113 (1939). *Doudna,* a case involving false uttering of a postdated check, accepts the *Chaplin*-style argument that promises to pay in the future are not sufficient to prove the offense because they do not refer to existing facts. *Doudna,* 226 Iowa at 357, 284 N.W. at 117. Hogrefe attempts to use *Doudna* and the line of cases citing *Doudna* for his contention that his checks may not be used as evidence of theft by deception.

The line of cases Hogrefe cites supports his contention. We stated in *McFadden*—a theft by check case—that if it is established that both parties understood a check was not cashable when delivered (the check was postdated for instance), then "criminal liability is precluded as a matter of law." *McFadden,* 467 N.W.2d at 581. In *State v. James,* 310 N.W.2d 197 (Iowa 1981)—another theft by check case—this court held that there is no "deception" in a case of a check allegedly made and presented with the agreement it would be held and was not immediately payable. *James,* 310 N.W.2d at 200–01. Most

recently, in *Rojas–Cardona*, we reiterated *McFadden's* declaration:

> Our holdings established that when there is an understanding between the parties that a check is not cashable [the check is not payable from funds on deposit] at the time it is received, but will be made so at some time in the future, the representations made are only promises, there is no deception and, thus, no criminal liability results under section 714.1(6) [theft by check].

*Rojas–Cardona*, 503 N.W.2d at 594 (emphasis omitted).

There are several problems with this line of cases (*Rojas–Cardona, McFadden,* and *James* ) that Hogrefe cites in support of his argument. First, this line of cases follows dicta from *Doudna; Doudna* derived this dicta from *State v. Cooper,* 169 Iowa 571, 151 N.W. 835 (1915); *State v. Cooper* was implicitly overruled by *West* in 1977. *Cooper* involved a conviction of false pretenses in giving a postdated check and was decided in 1915. *Cooper,* 169 Iowa at 577, 151 N.W. at 838. *Cooper* was, therefore, of the same vintage and statute as the cases overruled in *West. West,* 252 N.W.2d at 460–62. *Cooper,* also, and most importantly, recognized and agreed with exactly that position rejected in *West:* promises to pay in the future are not sufficient to prove theft because they do not refer to existing facts. *Cooper,* 169 Iowa at 576, 151 N.W. at 838.

Second, this line of cases involving theft by check seriously undermines theft by deception as an all-encompassing statute. It rewards crafty criminals for no rational purpose—at least as defined by *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709, 711 (1895) (rejecting challenge to a promise of future payment constituting a false pretense under federal mail fraud statute).

Last, this line of cases refers to theft by check as "deception" and therefore creates a language problem in distinguishing the offense, theft by deception.

■ Our solution to this dilemma is clear. Under either charge—theft by deception or theft by check—a postdated check can be evidence of deception even though both parties knew the check was not good at the time the defendant issued it. In these circumstances, criminal liability should attach if at the time the defendant issued the check, the defendant (1) never had the intention to pay the check or (2) knew he or she would not be able to pay it. We now overrule our prior theft by check cases holding otherwise. Our solution is consistent with the interplay of theft by deception laws and theft by check laws found in sections 223.3 and 224.5 of the Model Penal Code.

B. *The merits.* With these principles in mind, we turn to two questions we must answer in resolving Hogrefe's sufficiency of the evidence challenge to the marshalling instruction on theft by deception. First, was there sufficient evidence to establish deception on the part of Hogrefe when he issued the checks? Second, if there was, did Hogrefe obtain the Pursuit and cash from NICE by such deception?

1. *Was there sufficient evidence to establish deception on the part of Hogrefe when he issued the checks?* With this question we focus on Hogrefe's intention and knowledge at the time he gave the seven postdated checks. The postdated checks constituted a promise on Hogrefe's part to pay the checks in the future. Was there, therefore, substantial evidence that at the time Hogrefe issued the checks to NICE he either (1) had no intention to pay them or (2) knew he would not be able to pay them?

Viewing the evidence in the light most favorable to the State, we think the jury could reasonably find from the circumstantial evidence presented that—at the very least—Hogrefe knew he would not be able to pay the checks when he issued them.

Hogrefe was financially in trouble when he approached Houge and Dunbar. He had obligated himself to pay back $425,000 by December 1. He had no means to do so because he had purchased and resold chemicals with the $425,000 but could not remember what had happened to the sales proceeds. He had secured the payment of the $425,000 with a mortgage on his house and a security interest on his crops.

It was at this point, when Hogrefe was in trouble financially, that he approached NICE in hopes of securing enough money to pay back the $425,000. The jury could reasonably ask: If Hogrefe did not have the financial wherewithal to pay back $425,000, how could he honestly believe he could pay back about $500,000 ($262,000 in the first transaction and $231,500 in the second transaction) to NICE? In short, Hogrefe had an antecedent debt he was desperate to pay, and he used the chemicals and money he obtained from NICE to pay off the debt with no apparent way of paying back NICE. Hogrefe's unsuccessful insurance scam and subsequent bankruptcy serve as further circumstantial evidence supporting a finding that Hogrefe knew when he sought the $500,000 from NICE that he could not pay back such a sum of money.

■ The position of the Model Penal Code on theft by deception supports our analysis. Section 223.3 of the Model Penal Code defines theft by deception as follows:

A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:

(1) creates or reinforces a false impression, including false impressions as to ... intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise....

Comment 1 to section 223.3 pertinently states:

Theft by deception under section 223.3 requires proof of purpose. The actor must have the purpose to obtain the property of another, and he must have a purpose to deceive. If the actor believes in the accuracy of the impression he seeks to convey, he will not be guilty of a violation of section 223.3 even if his belief is unreasonable. On the other hand, paragraph (1) makes it clear that the actor's own state of mind may be the subject of the deception. It is not necessary for the prosecution to prove that the defendant affirmatively disbelieved the representations he made. If he creates the impression that he believes something to be true when in fact he has

no belief on the subject, he has purposely deceived as to the state of his mind.

The jury could reasonably find from the circumstantial evidence we have sketched out above that Hogrefe was creating an impression that he did or would have the means to repay NICE for the almost $500,000 in chemicals and cash he received when in fact he had no such belief.

That brings us to the second question we must answer.

2. *Did Hogrefe obtain chemicals and cash from NICE by deception?* This question focuses on the language "[o]btains ... transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another, by deception" in section 714.1(3). The Model Penal Code defines "obtains" to mean in relation to property, "to bring about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another." Model Penal Code § 223.0(5). As one can see, this definition follows closely the language after the word "obtained" in section 714.1(3).

(a) *The first transaction with NICE.* As recalled, in the first transaction, Hogrefe agreed to buy 500 gallons of Pursuit from NICE and wrote four checks for $262,200 as payment for the 500 gallons. All four checks were dated December 22, 1991. Hogrefe gave the checks to Houge on this date with the understanding that the checks were to be cashed at different times. The chemicals were ordered on December 30 and arrived at NICE's Plymouth facility on January 2. Hogrefe picked up the Pursuit that day and delivered it to Pattison Grain as final payment on the $425,000 obligation. NICE presented the four checks for payment at some point but the checks were returned for insufficient funds.

■ The jury could easily find that Hogrefe obtained the chemicals on the strength of the four postdated checks he wrote, checks that Hogrefe knew he could not cover. Thus, with regard to this transaction, we conclude there was substantial evidence from which the jury could find that Hogrefe obtained the 500 gallons of Pursuit by deception.

(b) *The second transaction with NICE.* The second transaction with NICE presents a problem. As recalled, December 24—two days after Hogrefe wrote the four postdated checks to NICE for the 500 gallons of Pursuit—Houge wrote Hogrefe a check from the NICE account for $230,000. On the same date, Hogrefe signed over the check to Midwest as part payment on the $425,000 advance.

Two days later on December 26, Houge called Hogrefe into NICE's Portland facility. At Houge's request, Hogrefe gave Houge three postdated checks made out to NICE for $231,500. Two checks were dated December 28 and one was dated December 29. Houge was to hold all three checks until Hogrefe approved their deposit.

Houge testified he asked for the three postdated checks to correct his "mistake" for giving Hogrefe the $230,000 advance. The additional $1500, Houge explained, was to be "interest" on the $230,000.

■ Clearly, Hogrefe did not obtain the $230,000 on the strength of the three postdated checks he gave Houge. The checks could not, therefore, support a theft by deception charge. Nevertheless, instruction 8—the marshalling instruction—instructed the jury that they could consider these checks on the theft by deception charge. The instruction is very clear on this point:

> On or about the 24th day of December, 1991, the defendant *received cash and/or agricultural chemicals* from [NICE] *in exchange for a series of checks* written to [NICE].

The italicized language gives the jury three options. The jury could find that Hogrefe received (1) cash for checks (the second transaction), (2) both cash and chemicals for checks (both transactions) or (3) chemicals for checks (the first transaction).

■ What we have then is a marshalling instruction that allows the jury to consider three theories of culpability, only one (chemicals for checks) of which is supported by the evidence. With a general verdict of guilty, we have no way of determining which theory the jury accepted. Because there was insufficient evidence to support an instruction to consider *all* the checks, the district court erred in giving the marshalling instruction.

### III. *Disposition.*

Because the district court erred in giving the marshalling instruction, we reverse and remand for a new trial.

REVERSED AND REMANDED.