**STATE of Iowa, Appellee,**

v.

**Monzelle MILLER, Appellant.**

No. 97–1929.

Supreme Court of Iowa.

Feb. 17, 1999.

Linda Del Gallo, State Appellate Defender, and Martha J. Lucey, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Martha E. Boesen, Assistant Attorney General, John P. Sarcone, County Attorney, and Jeff Noble, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and TERNUS, JJ.

NEUMAN, Justice.

Monzelle Miller operated a successful cottage industry from her cell at the Iowa Correctional Institution for Women at Mitchellville. Through the medium of love letters she managed to swindle several male correspondents out of substantial sums of money. The question on appeal is whether her conviction for theft by deception can be upheld against a challenge to one element of the court's marshaling instruction—that her guilt could rest, in part, on proof that she misrepresented her "romantic intentions" to the victims. Finding no error in the court's instruction, we affirm.

The facts are largely undisputed. During her tenure as a prisoner at the women's reformatory, Monzelle Miller engaged in extensive correspondence and phone calls with a number of men she "met" through advertisements in "singles" newspapers. This appeal focuses on her simultaneous relationships with three men aged seventy-two, sixty-nine, and thirty-six.

Miller's correspondence with the men began on a casual, friendly basis. Their letters soon progressed, however, to mutual expressions of affection, long-term commitment, and promises of explicit sexual gratification. Miller's prose evidently captivated her victims and captured their hearts. As one witness noted, Miller "wrote letters where you just wanted to read them over and over." All three victims believed Miller planned to move in with them upon her release from prison.

Sprinkled among the many promises of devotion upon her release were requests for cash and personal items. The men responded with certified checks, money orders and catalog purchases billed to their personal

credit cards. Their testimony revealed some equivocation about whether they regarded the transactions as gifts or loans. It is plain, however, that each man believed Miller needed financial assistance and each one regarded his help as an investment in their future.

At some point prison officials got wind of a scam afoot within the prison. When the institution began returning the checks to their senders, Miller told her pen pals to direct their largess to her "attorney," David Porter. Porter was not in fact an attorney but one of Miller's confederates. The record reveals that the sum funneled through Porter for Miller's benefit totaled roughly $14,000.

A postal investigator ultimately became involved in the case when one of the victims reported that a check delivered to the reformatory was allegedly "stolen" and Miller requested a replacement. It was soon learned that Miller had been released from prison but had failed to follow through on her promises to join any of her correspondents. An examination of Miller's prison account deposits yielded names and addresses of men taken in by Miller's scheme. Miller, when interviewed by the investigator, admitted writing the letters and extending promises of love, and even marriage, to her correspondents. She acknowledged having sought and received sums of money from them but contended the men were no more than "perverts who wanted her to write and talk dirty to them." She conceded, however, that her overall conduct was "kind of deceiving."

The State charged Miller with three counts of second-degree theft by deception, a class "D" felony, as an habitual offender. *See* Iowa Code §§ 714.1(3), 714.2(2), 902.8 (1995). Iowa Code section 714.1(3) states that a person commits theft when she "[o]btains the labor or services of another, or a transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another, by deception." Pertinent to this appeal, "deception" is defined in alternative ways at section 702.9 as follows:

1. Creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true.

2. Failing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed.

. . . .

5. Promising payment, the delivery of goods, or other performance which the actor does not intend to perform or knows the actor will not be able to perform. Failure to perform, standing alone, is not evidence that the actor did not intend to perform.

Theft of property valued in excess of $1000 but less than $10,000 is theft in the second degree. Iowa Code § 714.2(2).

■ Based on the record sketched above, a jury found Miller guilty as charged. At trial, and now on appeal, Miller alleges error in the court's marshaling instruction to the jury. Following the format outlined in Iowa Criminal Jury Instruction 1400.10, the court described the factual premise for the State's charge this way:

Between March 16, 1995, through December 10, 1996, the Defendant did misrepresent her financial needs *and/or romantic intentions to* [named victims].

(Emphasis added.) Miller contends that criminal culpability cannot rest on deceit regarding "romantic intentions." The State responds by conceding that the law "has accorded some immunity for false promises." It argues, however, that this case does not fall within any exceptions recognized by Iowa's statutes. For the reasons that follow, we agree.

Our theft-by-deception statute, section 714.1(3), was enacted in 1976 to replace earlier statutes variously criminalizing "false pretenses, frauds, and other cheats." *State v. Hogrefe,* 557 N.W.2d 871, 876–77 (Iowa 1996). Patterned after the Model Penal Code, section 714.1(3) "clarified the legislature's intent to criminalize every instance of a person obtaining another person's property by deception." *Id.* at 877; *see also State v. Ross,* 573 N.W.2d 906, 912 (Iowa 1998) (Model Penal Code adopts a comprehensive definition of criminal fraud). "Theft by deception," we said in *Hogrefe,* "is meant as a catch-all crime to encompass the full and ever chang-

ing varieties of deception." *Hogrefe,* 557 N.W.2d at 878; *cf. State v. Kraklio,* 560 N.W.2d 16, 18 (Iowa 1997) (noting statute governing securities transactions must be flexible enough to match countless schemes devised by those seeking to use other's money on the promise of profit). When the alleged deception relates to unfulfilled promises,

> the inquiry centers on (1) whether the defendant intended to perform or (2) whether the defendant knew he or she would not be able to perform. Proof as to either prong depends in most cases on circumstantial evidence.

*Hogrefe,* 557 N.W.2d at 878.

The Model Penal Code, from which this court drew guidance in *Hogrefe* and *Ross,* specifically exempts from its definition of deceit "falsity as to matters having no pecuniary significance." Model Penal Code § 223.3 (1980). Iowa Code section 702.9, defining deception, contains no such caveat. Miller nevertheless contends that, in interpreting our theft-by-deception statute, we should follow the Model Penal Code's lead. Not only does deceit in the realm of romantic intentions have no pecuniary significance, Miller argues, it would be contrary to public policy and legislative will to criminalize insincerity in such matters.

We reject Miller's argument on two grounds. First, it is axiomatic that we may not—under the guise of statutory construction—enlarge or otherwise change the terms of a statute as the legislature adopted it. *Marcus v. Young,* 538 N.W.2d 285, 289 (Iowa 1995). Given our legislature's nearly wholesale adoption of the Model Penal Code's theft-by-deception language, we deem it significant that it elected *not* to incorporate the "pecuniary significance" exception. Legislative intent is, of course, expressed by omission as well as inclusion. *Id.*

Second, the record plainly reveals that Miller has not been prosecuted for merely breaking promises of romantic intention, but for deliberately using her false promises as a vehicle for parting her victims from their money. Defense counsel strenuously urges that the latter practice is not uncommon among single persons, and that by criminaliz-ing the conduct here the State puts many failed relationships in jeopardy of prosecution. We are not so persuaded.

Miller admitted being "trained" by another inmate in the technique of writing letters that would reach the men on an emotional level, paving the way for later financial requests. Moreover, the record is replete with proof of her deliberate intent to mislead the men from the outset. For example, she sent her victims purported photos of herself which were actually of a woman not even of the same race, proof that she had no intent to ever meet the men face-to-face. The requests she made for financial assistance— *e.g.,* to pay for surgery, car licenses, lawyer's fees, and traffic fines—were not legitimate inmate expenses. And Miller did not use the payments for such purposes. The record reveals that much of the money was forwarded to her mother and other family members; the remainder held by Porter was used to purchase Miller a vehicle. Finally, it appears plain that Miller had no intent, or ability, to simultaneously follow through on her promises of marital/sexual bliss with three separate victims. But more importantly, these misrepresentations of "romantic intention" were motivated solely by Miller's desire to make her victims more vulnerable to misrepresentations of a financial sort.

In sum, we believe the challenged jury instruction enjoys substantial support in the law and in this record. Accordingly, we affirm the judgments entered upon the jury's verdicts.

**AFFIRMED.**