# IN THE COURT OF APPEALS OF IOWA

No. 3-1192 / 12-1076
Filed April 30, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DENNIS BROUSE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


        A defendant appeals a conviction for fraudulent practice.  **REVERSED**

**AND REMANDED.**


        Angela Campbell of Dickey & Campbell Law Firm, P.L.C., Des Moines, for

appellant.

        Thomas J. Miller, Attorney General, Martha E. Trout, Assistant Attorney

General, Thomas H. Miller, Deputy Attorney General, John Sarcone, County

Attorney, and Rob Sand, Assistant County Attorney, for appellee.


        Heard by Danilson, C.J., and Vaitheswaran and Mullins, JJ.

**MULLINS, J.**

Dennis Brouse appeals from a conviction for fraudulent practice in the first degree. He argues the conviction must be reversed for four reasons: (1) there is insufficient evidence for the verdict, (2) the district court permitted irrelevant testimony, (3) the district court erred in the jury instructions, and (4) the district court erred in denying Brouse's motion to dismiss. We reverse Brouse's conviction.

## I. BACKGROUND FACTS AND PROCEEDINGS

In 2007 the Iowa legislature enacted the Iowa Film, Television, and Video Project Promotion Program (Film Program). The Film Program was created to bring filmmakers and television producers from other locations to Iowa with the hope they would spend money in Iowa and grow the economy. The program, administered by the Iowa Film Office, offered transferable tax credits to producers and investors for qualified expenditures from Iowa-based businesses. Tom Wheeler ran the Iowa Film Office and assisted filmmakers and television producers with tax credits. Filmmakers and producers had to apply to the Iowa Film Office in order to be approved for the tax credits. After the Iowa Film Office approved a film project, the filmmaker or producer would provide a list of expenditures to the Iowa Film Office. The Office would then review the expenditures and issue a tax certificate. The tax certificate could be used to reduce a tax liability owed to the State of Iowa. If the filmmaker or producer did not owe Iowa taxes, the tax credit could be sold to a third party that did have tax liability to the State.

Dennis Brouse had developed a television program about horses for Nebraska Educational Telecommunications (NET). After failing to find enough cash funding, Brouse and NET parted ways. Brouse contacted Wheeler about the possibility of his television program obtaining tax credits from the State of Iowa. Brouse then moved his corporation (Changing Horses) and his television program (*Saddle Up*) to Iowa. Brouse hired Chad Witter, a certified public accountant, to help with the tax credits. Wheeler believed Witter had a vast knowledge of the Film Program.

The Iowa Film Office had preapproved the use of "in-kind" exchanges—exchanges for services, such as advertising or sponsorships, or goods, but no cash exchange—as qualified expenditures. Additionally, the Iowa Film Office allowed a pass-through corporate structure, where an Iowa corporation is created as the business entity to allow non-Iowa sponsorships to qualify as expenditures under the Film Program. These expenditures would be submitted to the Iowa Film Office and the filmmaker or producer would receive tax credits for approximately half of the expenditures. Changing Horses received $9 million in tax credits.

Some of these expenditures were for sponsors of *Saddle Up*. Sponsors would support *Saddle Up* by advertising *Saddle Up* on their products or websites and in exchange, the sponsor's company or product would be featured in a *Saddle Up* television spot or other *Saddle Up* advertisements. All the sponsorships were in-kind exchanges—*Saddle Up* and its sponsors did not exchange cash—and were submitted to the State for approximately $1 million in

expenditures. Even though Changing Horses submitted all sponsorships for $1 million in expenditures to the State, some *Saddle Up* sponsors required that Changing Horses remove the $1 million valuation from the sponsorship contract. Such sponsors believed valuing an in-kind exchange was difficult, and they did not want to deal with their own possible negative tax implications of a $1 million exchange. Changing Horses agreed to remove the dollar valuation for those sponsors concerned with the $1 million and signed the sponsorship agreement without any valuation.

Brouse submitted many purchases as qualified expenditures relevant to this case. One such expenditure was submitted as a claim of an in-kind exchange. Brouse purchased a thirty-eight-foot camper from Shirley and Wayne Weese. The Weeses offered Brouse the trailer for $10,500and he paid them $10,500 in cash. The purchase agreement stated the purchase price was $21,000 and the Changing Horses expenditure sheet, as submitted to the Iowa Film Office, claimed a $22,500 qualified expenditure. The Weeses testified they agreed to a $13,000 purchase price, but Brouse asked them to sign the $21,000 purchase agreement to facilitate tax credits. Brouse also asked Shirley Weese to tell the person calling from the Iowa Film Office that the trailer was purchased for $21,000. The audit tie-out sheet (a document linking the expenditure claims to specific records from the production accountant) showed Brouse paid in cash $10,500 and in services $10,500 to the Weeses. The Weese's restaurant was subsequently advertised in *Saddle Up*. However, the Weeses did not know their

restaurant would be advertised and testified that they did not agree to be paid in advertising.

The Iowa Attorney General charged Brouse and Witter with fraudulent practice in the first degree, theft in the first degree, and ongoing criminal conduct. Brouse moved to sever the defendants and was later tried alone. After receiving a bill of particulars, Brouse filed a motion to dismiss the charges. The Attorney General amended the trial information and bill of particulars. The district court denied Brouse's motion to dismiss. Before trial, Brouse filed a motion in limine in order to stop any testimony about Brouse's purchased home and Changing Horses profits. The district court denied the motion. The jury returned a general verdict finding Brouse guilty of first-degree fraudulent practice and not guilty of theft and ongoing criminal conduct. Brouse filed a motion for new trial, which was denied. Brouse appealed his conviction.

## II. STANDARD OF REVIEW

Brouse offers four reasons why the court should reverse his conviction. We need only address one. The court reviews sufficiency of the evidence challenges for corrections of errors at law. *State v. Keopasaeuth*, 645 N.W.2d 637, 639–40 (Iowa 2002). We review jury instructions for corrections of errors at law. *State v. Frei*, 831 N.W.2d 70, 73 (Iowa 2013). If there is an error in giving or refusing to give a particular instruction, we will reverse unless the record shows there was no prejudice. *Id.*

## III. ANALYSIS

We look at "the evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* We will uphold the verdict if it is supported by substantial evidence. *Id.* "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005).

The jury in this case returned a general verdict and found Brouse guilty of fraudulent practice. When a jury returns a general guilty verdict, the court has no way to determine which theory presented by the State the jury accepted. *State v. Hogrefe*, 557 N.W.2d 871, 881 (Iowa 1996). When the jury instructions present multiple theories to find the defendant guilty, there must be sufficient evidence of each theory. *See id.* This is because "the validity of a verdict based on facts legally supporting one theory for conviction of a defendant does not negate the possibility of a wrongful conviction of a defendant under a theory containing legal error." *State v. Martens*, 59 N.W.2d 481, 485 (Iowa 1997).

Here, the jury instructions stated, "Under Count I [fraudulent practice], the State must prove the defendant committed, or aided and abetted others in the commission, or acted in joint criminal conduct in the commission, or acted as an employer knowingly permitting an employee in commission, of all the following elements." Because of the general verdict, there must be substantial evidence that Brouse committed fraudulent practice by all four theories.

We can dispose of this appeal by addressing one of the legal theories. Brouse argues his conviction must be overturned because there is not sufficient

evidence of joint criminal conduct. The joint criminal conduct jury instruction stated "[i]f [the jury] find[s] the State has proved all of [the joint criminal conduct] elements, the defendant is guilty of the crime of Theft and Fraudulent Practice." Thus, if the jury had relied upon the joint criminal conduct legal theory, then it would have found Brouse guilty of both theft and fraudulent practice. Brouse was found not guilty of theft, so he argues the jury could not possibly have relied upon joint criminal conduct as a theory of culpability. He then reasons that because the jury returned a general verdict and one of the theories in the jury instruction on fraudulent practice was impossible—joint criminal conduct—the conviction must be reversed. *See Hogrefe*, 557 N.W.2d at 881. The State concedes the joint criminal conduct theory could not have been the basis for the jury's verdict. Yet, the State argues that since the jury found Brouse not guilty of theft, it clearly did not rely on joint criminal conduct to convict Brouse of fraudulent practice, and the State has taken the position it does not need to argue there was sufficient evidence of this theory upon appeal.

For us to accept the State's argument, we must first agree that the jury rejected the theory of joint criminal conduct when it acquitted Brouse of theft. The jury is presumed to have followed jury instructions. *State v. Becker*, 818 N.W.2d 135, 162 (Iowa 2012). When we review a jury verdict, we are not "to engage in highly speculative inquiry into the nature of the jury deliberations." *State v. Halstead*, 791 N.W.2d 805, 815 (Iowa 2010). Instead, we "focus solely on the elements of the crime, the jury verdicts, and the instructions in the case." *Id.*

Jury instructions must be written "to give the jury a clear understanding of what they need to decide." *Lovick v. Wil-Rich*, 588 N.W.2d 688, 695 (Iowa 1999). The district court instructed the jury on the legal theory of joint criminal conduct as follows:

> When two or more persons act together and knowingly commit a crime, each is responsible for the other's acts during the commission of the crime. This is called Joint Criminal Conduct. The defendant's guilt is the same as the other person's unless the acts could not reasonably be expected to be done in aiding the commission of the crime.
>
> The State must prove all of the following elements:
> 1. The defendant acted together with at least one other person.
> 2. The defendant and the other person or persons knowingly participated in the *crime of Theft and Fraudulent Practice*, as defined in Instruction No. 13, 15 and 16.
> 3. While furthering the *crime of Theft and Fraudulent Practice*, the other person or persons committed a different crime or different *crimes of Theft and Fraudulent Practice*, as defined in Instruction No. 13, 15 and 16.
> 4. The defendant could have reasonably expected that the different *crime of Theft and Fraudulent Practice* would be committed in furtherance of the *crimes of Theft and Fraudulent Practice*.
>
> If you find the State has proved all of these elements, the defendant is guilty of the crime of Theft and Fraudulent Practice.

(Emphasis added.) Generally under Iowa law, joint criminal conduct requires four elements. First, the defendant must have acted in concert with another person. *State v. Smith*, 739 N.W.2d 289, 294 (Iowa 2007). Second, the defendant must knowingly participate in a public offense. *Id.* Third, "[a] 'different crime' must be committed by another participant in furtherance of the defendant's offense." *Id.* Fourth, "[t]he commission of the different crime must be reasonably foreseen." *Id.* "In furtherance of" includes "acts done to promote or advance the

underlying crime [and] acts done while furthering that offense." *Id.* Comparing general Iowa law and the jury instructions given in this case, a couple issues emerge.

One problem with the instruction is that it inextricably links two *separate* crimes—theft *and* fraudulent practice—consistently throughout the entire instruction. By linking the two, it is difficult to understand the meaning of element number 2 of the jury instruction. Element number 2 states that Brouse "and the other person or persons knowingly participated in the crime of Theft and Fraudulent Practice." The instruction is unclear as to whether element number 2 could be satisfied by one factual situation that the jury determined to be both theft and fraudulent practice or two different factual situations (for example, one factual situation was theft and another factual situation was fraudulent practice). The use of the word "crime" is also puzzling. The instruction uses the singular "crime" but names two separate crimes. It is not clear whether "crime" was intended to be singular or plural.[1] Linking the crimes together makes it impossible for this court—and presumably the jurors—to discern what exactly is meant.

Elements number 3 and 4 create additional confusion. Element number 4 states that Brouse "could have reasonably expected that the different crime of Theft and Fraudulent Practice would be committed in furtherance of the crimes of Theft and Fraudulent Practice." This instruction does not identify that the

---

[1] A simple typographical error would not be prejudicial and therefore not sufficient to overturn a conviction. However, this jury instruction contained multiple errors, which together make the instruction confusing and render it prejudicial.

"different crime," committed by another person, is supposed to be furthering Brouse's separate, underlying crimes. *Id.* at 294. As written, the instruction is not clear as to what theft and fraudulent practice the "different crime" is furthering. Also, the "different crime of Theft and Fraudulent Practice" is apparently referring back to element number 3's reference to "different crime or different crimes of Theft and Fraudulent Practice," but the language fails to parallel as element number 4 uses a singular while element number 3 allows the jury to consider either some other crime or different crimes (plural) of theft and fraudulent practice. Without clearly showing the link between the other person's crimes and Brouse's separate crimes, element number 4 does not adequately instruct the jury on the joint criminal conduct requirements.

We cannot agree with the State that the jury obviously rejected the theory of joint criminal conduct. The joint criminal conduct jury instruction was so confusing that we are not confident the jury was able to parse through the unclear elements and properly assess Brouse's guilt under that theory. When a jury instruction is "conflicting and confusing, error is presumed prejudicial and reversal is required." *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 97 (Iowa 2013) (internal quotation marks omitted).

Brouse did not specifically challenge the terms of the joint criminal conduct jury instruction. However, he clearly challenged the ability of the jury to convict him of fraudulent practice after having acquitted him of theft—in his view having rejected joint criminal conduct—and he clearly challenged the sufficiency of the evidence to convict him of fraudulent practice. In this context, we necessarily

examined how the jury was instructed in order to determine whether the evidence was sufficient to convict him under the legal theories presented. After examining the jury instruction and finding it so confusing, we conclude that it was not possible for the jury to find sufficient evidence to convict pursuant to a general verdict that implicated the joint criminal conduct instruction.

Having determined that the general verdict cannot be supported as to joint criminal conduct, we must reverse the conviction in this case.

**REVERSED AND REMANDED.**

Danilson, C.J., concurs; Vaitheswaran, J., dissents.

**VAITHESWARAN, P.J.,** (dissenting)

I respectfully dissent. Brouse does not challenge the district court's decision to give an instruction on joint criminal conduct. *See State v. Smith*, 739 N.W.2d 289, 294 (Iowa 2007) (referring to defendant's contention that there was insufficient evidence to submit a joint criminal conduct instruction to the jury); *State v. Jackson,* 587 N.W.2d 764, 766 (Iowa 1998) (citing defendant's argument that joint criminal conduct instruction had "no application to the facts in the present case"). Brouse also does not challenge the language of the joint criminal conduct instruction that was given. These issues are simply not before us.

Even if Brouse raised these issues in his appellate brief, I would conclude they were not preserved for our review. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Brouse has not pointed us to any portion of the record where he argued there was insufficient evidence to give an instruction on joint criminal conduct or where he contested the language of the instruction. Right or wrong, the instruction on joint criminal conduct became the law of the case. *State v. Taggert*, 430 N.W.2d 423, 425 (Iowa 1988).

Brouse does challenge the sufficiency of the evidence supporting his fraudulent practice conviction under a joint criminal conduct theory. But his present challenge is not the same as the challenge he raised in the district court. On appeal, Brouse's attorney asserts, "[I]t is impossible to pinpoint which crimes the State argued at trial [he] committed, and which ones he did not commit but

Witter committed." Brouse's attorney continues, "Having argued that [he] was the principal in every alleged criminal transaction, it would be inappropriate on appeal for the State to try to claim that Witter committed one of those crimes and [he] did not commit it, simply to avoid reversal." At trial, Brouse's attorney moved for judgment of acquittal solely on the basis of the State's failure to prove the knowledge and specific intent elements of fraudulent practice. While he mentioned the joint criminal conduct theory, his challenge to the evidence supporting that theory echoed his earlier contention that the State failed to prove the knowledge element. He stated, "[T]here has not been any evidence that Mr. Brouse knowingly approved or knowingly agreed with the conduct of Mr. Witter." He continued, "The second basis, judge, can be joint criminal conduct. Again, we are struck with knowingly. I will not go through everything I just said, but everything applies. . . . There was no knowing joint conduct in this case, for the same reasons as I just stated." This argument had nothing to do with who committed what crime. *See Smith*, 739 N.W.2d at 293 *(*citing defendant's contention that there was no evidence to establish he knowingly participated "in a previous, underlying public offense that constituted a different crime in furtherance of [a codefendant's] offenses").

I would conclude Brouse's present challenge to the sufficiency of the evidence supporting the joint criminal conduct theory of fraudulent practice was not preserved for review. *See State v. Crone*, 545 N.W.2d 267, 270 (Iowa 1996) (concluding a motion for judgment of acquittal did not preserve error on a specific argument made on appeal when that ground was not asserted below).