# IN THE COURT OF APPEALS OF IOWA

No. 18-0096
Filed March 20, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CHAKA KHAN FIELDER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell (trial) and Robert B. Hanson (suppression), Judges.

A defendant appeals her convictions for first-degree theft by deception and tampering with a witness. **REVERSED AND REMANDED.**

Angela Campbell of Dickey & Campbell Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., Bower, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**Per Curiam.**

Chaka Khan Fielder did not commit dependent adult abuse. But through its evidence and arguments, the prosecution implied she did. That implication, we think, potentially confused the jury and unfairly prejudiced Fielder. We find the evidence sufficient to support the verdicts on the actual charges—theft by deception and tampering with a witness. But, because the improper evidence was irrelevant to the actual charges, and the record did not affirmatively establish Fielder was not prejudiced by its admission, we reverse and remand for a new trial.

**I.      Facts and Prior Proceedings**

Starting in January 2014, Fielder worked as a certified nursing aid at Spurgeon Manor, a retirement community offering independent living apartments, rehabilitation, and skilled nursing care. There she befriended Stanley Erickson. Fielder helped care for Erickson's wife in the skilled nursing facility before his wife died in December 2014. Stanley lived in an independent-living apartment, and Fielder did not at any time provide nursing services to him. Fielder stopped working at Spurgeon Manor in January 2016, but her friendship with Erickson continued.[1]

At some point in 2015, Fielder began asking Erickson for money. Erickson agreed because Fielder "was so kind" to and did "such a good job taking care" of his wife of sixty-three years before her passing. "I just felt I was obligated to return the favor, and so I did, not knowing I was going to get in this far." Erickson testified

---

[1] Neither party alleges Erickson is not of sound mind.

Fielder confided in him about her problems and asked for money on numerous occasions, offering various reasons:

> One of them was her son passed away. She needed money for the funeral. One time was she needed bail money. One time she—she was in the process of buying a house, and she needed money for a down payment for that. And then later on, then, the furnace went out, and so she needed money to get her furnace repaired or replaced. And then they—during that process, the water line froze up, and so she needed assistance to pay for the—to get that repaired. Needed money to help buy a car. And she needed money because she was ill. She had been diagnosed with cancer and was in need of some surgery.

Erickson wrote Fielder numerous checks and gave her cash. At trial, he did not recall specifically how many checks he wrote, or the amounts of the checks. He also was not sure how much cash he gave to Fielder. Erickson testified Fielder was "very convincing," appearing "very upset, happy, tearful. Just like she was really in dire need, and so I believed her." He also testified he would occasionally meet her at Walmart in Grimes or Love's gas station to give her cash. On several occasions, Fielder came with a woman she introduced as her sister. Erickson later learned she was Fielder's wife, Jacqueline.

Eventually, Erickson grew skeptical Fielder could ever repay all the money he loaned her. When asked why he kept giving her money, Erickson replied, "She needed it." He testified he and Fielder discussed that she was going to pay it back. At one point, she did repay him $600 after he wrote a check in an amount greater than she needed.

Erickson helped Fielder buy a car when she told him she "lost" hers. She said she needed a car big enough to hold her whole family. He went with her to a car dealership, made a down payment of "several thousand" dollars on a Dodge

Durango, and cosigned the note. He testified he did not understand he was taking on a debt and expected her to make the car payments. But he ended up paying off the car debt when Fielder stopped making the payments.

In late 2016, Melissa Conner, an investigator for the Economic Fraud Control Unit of the Iowa Department of Inspections and Appeals (DIA), was investigating Fielder and her wife for irregularities in the receipt of government benefits. Using the administrative subpoena power provided under Iowa Code section 10A (2016), Conner obtained Fielder's bank records. Conner noticed large deposits into Fielder's account of checks from Stanley Erickson. She also noticed Erickson's address was the same as the facility where Fielder was employed. Because it was a nursing home, Connor found "cause for concern" and passed her evidence to the Medicaid Fraud Control Unit (MFCU).

The MFCU investigator, Daniel Hoffa, testified at trial. He reviewed the documents Conner passed along and continued his own investigation, including obtaining Erickson's bank records and interviewing Erickson and Fielder. Reviewing the records and statements, Hoffa observed check and cash withdrawals from Erickson's bank account matching checks and cash deposited into Fielder's account. The checks ranged in amount from $600 to $6200. The cash withdrawals ranged from $1000 to $6200.[2] Hoffa calculated a total of $104,500 in withdrawals from Erickson's account in checks and cash. The corresponding checks deposited into Fielder's account totaled $54,800 and $22,795 in cash, suggesting Fielder retained $26,905 in cash without depositing it.

---

[2] In contrast, Erickson testified that when he withdrew money for himself, he withdrew around $300, which typically lasted him two weeks.

Hoffa also investigated the reasons Fielder gave Erickson for needing money and could not verify their legitimacy.

The State played an edited recording of Hoffa's interview with Fielder for the jury. In the interview, Fielder denied basing her pleas for financial help on the reasons recalled by Erickson, but admitted she took money from him. When asked whether she paid back any of the money, she said Erickson would not accept repayment.

The State also presented evidence about Fielder's employment at Spurgeon Manor. Administrator Maureen Cahill testified all staff members received an employee handbook, had time to read it, and were required to sign a form acknowledging they understood the policies. The handbook informed employees they were prohibited from accepting gifts, tips, or items of any value from residents. Cahill testified Fielder would have received the handbook when hired, but Cahill did not produce Fielder's signed form at trial.

Hoffa, a peace officer, filed a criminal complaint against Fielder on October 26, 2016, charging her with theft by deception in the first degree. Fielder was arrested, given a copy of the complaint, and released on bond. She made an initial appearance and pleaded not guilty on November 27.

Two days later, Fielder called Erickson and asked to meet at the Walmart in Grimes. There, she asked him to sign the following document she had written out by hand:

> I _____ gave Chakakhan Fielder monies (money) and she didn't deceive me or lie to me to obtain monies (money) from me. I wanted to help her on my own. I am not demented and I know exactly what I did for her and she has agree to make payments to me. I do not want her prosecuted. I do not want her sent to jail nor prison or

placed on probation. We both have agreed that we will work this out ourselves. Chakakhan Fielder knows she owes me money in the estimated amount of 74,000 dollars. And she has agreed to make payment I signed this letter with the intentions of having the state attorney drop the case against Chakakhan Fielder with no further actions needed. We will handle this between us. I never wanted Chakakhan Fielder to be charged with a crime I helped her on my own free will and deception did not play a part so please to whomever it concerns let me _____ and Chakakhan Fielder work this matter out on our own. She will start making payments at the beginning of the year January 2017.

       [Signatures of Erickson and Fielder.]

       I Chakakhan Fielder agree to pay Stanley Erickson payments every time I get paid until the estimated amount of 74,000 dollars is paid back. I agree not to miss a payment and continue to make payments on the Dodge Durango until fully paid off.

       [Signatures of Erickson and Fielder.]

       I signed both of these letters willingly with no threats or promises of anything besides a promise and agreement to receive payments from Chakakhan Fielder like stated before I don't want no criminal charges against her we are settling this on our own and I don't want her prosecuted this isn't a legal matter never should have been I'm in agreement with her on this matter and we worked it out.

       [Signatures of Erickson and Fielder.]

Erickson testified he signed the document to "[k]eep her from going to prison." Fielder then gave him $20. After that initial $20, Erickson did not receive any more payments from Fielder. Following the Walmart rendezvous, Investigator Hoffa interviewed Erickson again and filed a criminal complaint against Fielder for tampering with a witness. The court also entered a no-contact order.

In January 2017, the State filed a trial information charging Fielder with first-degree theft by deception and witness tampering. The case proceeded to trial, and the jury found Fielder guilty on both counts. In a special interrogatory, the jury found the amount stolen exceeded $10,000—the threshold for theft in the first degree. Fielder appeals.

**II.    Analysis**

Fielder asserts several grounds for reversal.  She first contends the jury instruction on theft by deception should have included an element of intent to permanently deprive.  Second, she argues the State did not offer substantial evidence to support the jury verdicts.  Third, she contends the district court erred in denying her motion to suppress evidence obtained by administrative subpoena.  Fourth, Fielder challenges three evidentiary rulings: (1) admission of the Spurgeon Manor employee handbook; (2) denial of a mistrial after Cahill testified about the handbook's reference to "dependent adult abuse"; and (3) publication of the recorded interview with Hoffa that contained "hearsay within hearsay."  Fifth, Fielder contends her trial counsel was ineffective in failing to object to the prosecutor's "burden-shifting" during closing argument.  And finally, Fielder contends the district court miscalculated restitution.  We address the first four issues in turn.  Because of our resolution of the fourth claim requires reversal and remand for a new trial, we need not reach the fifth and sixth issues.[3]

**A.  Intent to Permanently Deprive**

Before we decide if the State offered sufficient evidence of theft by deception, we must address the elements of the crime.  Fielder asserts an intent to permanently deprive another of property is an element of theft by deception, even though the phrase does not appear in the statute defining that alternative. *See* Iowa Code § 714.1(1)-(10) (2015).  She faults the district court for declining to include that element in its jury instruction on deception.

---

[3] We address Fielder's suppression issue because the admissibility of the challenged evidence may arise during retrial.

We review challenges to jury instructions for correction of errors at law. *State v. Tipton*, 897 N.W.2d 653, 694 (Iowa 2017). Erroneous jury instructions are presumed prejudicial absent an affirmative showing of lack of prejudice beyond a reasonable doubt. *Id.* (citing *State v. Ambrose*, 861 N.W.2d 550, 554 (Iowa 2015)). Reversal is required when instructions mislead the jury or materially misstate the law. *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 570 (Iowa 2017). Where the alleged error is a refusal to give a requested instruction, we "consider the jury instructions as a whole rather than in isolation to determine whether they correctly state the law." *State v. Benson*, 919 N.W.2d 237, 242 (Iowa 2017) (quoting *State v. Harrison*, 914 N.W.2d 178, 188 (Iowa 2018)).

As bearing on this analysis, a person commits theft when he or she does either of the following:

> 1. Takes possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof.
>  . . . .
> 3. Obtains the labor or services of another, or a transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another, by deception. Where compensation for goods and services is ordinarily paid immediately upon the obtaining of such goods or the rendering of such services, the refusal to pay or leaving the premises without payment or offer to pay or without having obtained from the owner or operator the right to pay subsequent to leaving the premises gives rise to an inference that the goods or services were obtained by deception.

Iowa Code § 714.1. The district court found "theft by deception" as defined in paragraph three did not include an element of "intent to permanently deprive," unlike theft by taking under paragraph one. It is true the legislature did not include the phrase "intent to permanently deprive" in each of the subsequent definitions of

theft.[4]  But, the element of permanent deprivation is nevertheless incorporated in the overall structure of section 714.1(3).

"Theft by deception" is a relatively recent addition to our criminal code; its precursor is "theft by false pretenses."  *See State v. Hogrefe*, 557 N.W.2d 871, 876 (Iowa 1996).  "In enacting section 714.1(3), . . . the legislature—for the most part— followed the lead of the American Law Institute Model Penal Code (1980)," therefore, the commentaries "are persuasive authority in our interpretation of our own theft by deception statute."  *Id.* at 876–77.  The change in language reflected "the legislature's intent to criminalize every instance of a person obtaining another person's property by deception."  *Id.* at 877.  Our supreme court has taken a broad view of the offense, rejecting the position a promise to return the property "with no intent to perform" did not constitute theft by false pretenses.  *State v. West*, 252 N.W.2d 457, 461 (Iowa 1977); *accord Hogrefe*, 557 N.W.2d at 877.  We also note the statute includes theft of the "labor or services" of another, which cannot be obtained on temporary basis.

The current code language provides the accused "obtain[ed]" something of value "by deception."  The Model Penal Code says "'obtain' means: (a) in relation to property, to bring about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another."  Model Penal Code § 223.0(5) (Am. Law. Inst. 1980).

The Model Penal Code commentary relates,

---

[4] In contrast, see, for example, Arkansas State Code section 5-36-103 (2013), defining theft as when a person "[o]btains the property or another person by deception or by threat with the purpose of depriving the owner of the property."

> Theft by deception is thus a crime designed to regulate the methods by which the transfer of a legal interest in property is achieved. It is not an offense designed to safeguard possession, nor does it protect against the use of deception to gain temporary possession or control of property or to continue a possession or control that was lawfully acquired.
>
> It should be noted, however, that the fact that deception is used to gain possession or control does not foreclose prosecution under the consolidated theft offense in cases where a subsequent conversion occurs. Section 223.3 would cover a person who gained temporary control over property by misrepresenting the purpose for which he wanted it and who then "exercises unlawful control" over the property "with purpose to deprive." . . . .
>
> Importantly, however, transfers of temporary or possessory interest in property will not be criminal, even though accomplished by deception, unless they threaten the interests protected by Section 223.2 [Theft by unlawful taking]. The actor must unlawfully take or exercise unlawful control with purpose to deprive or he must obtain a legal interest in the property by deception. Conduct short of this will not be theft.

Model Penal Code § 223.3 cmt. at 182.

As the Model Penal Code commentary suggests, the drafters' use of the word "obtain" encompasses an intent to deprive permanently, an aim beyond temporary possession or control. The commentary also clarifies theft by deception includes cases of "subsequent conversion" where the offender initially obtained temporary possession by misrepresentation.

The disputed instruction required the jury to find Fielder "obtained control or ownership of property owned by Stanley Erickson by the deception." The word "obtained" incorporated the requirement of permanent deprivation of Erickson's interest. Therefore, although we rely on a differential rationale, we conclude the district court did not err in declining to further instruct the jury on the intent to permanently deprive.

**B. Sufficiency of the Evidence**

Fielder contends the State's evidence did not support her convictions. We review claims of insufficient evidence for correction of errors at law. *Benson*, 919 N.W.2d at 241. "[W]e will uphold a verdict if substantial evidence supports it." *Id.* (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). Evidence is substantial if, "when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018)). We draw all reasonable inferences from the entire body of proof. *State v. Schlitter*, 811 N.W.2d 380, 389 (Iowa 2016). The inferences must be fair and rise above suspicion, speculation, or conjecture. *Id.*

**1. Theft by Deception.**

The court gave the jury the following marshalling instruction on theft by deception:

> The State must prove all of the following elements of Theft:
> 1. On or about August 11, 2015[,] through July 31, 2016, the defendant did make . . . untrue statements to Stanley Erickson.
> 2. The defendant knowingly deceived Stanley Erickson in one or more of the following ways:[5]
> > a. by creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true or
> > b. by failing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed.
> 3. The defendant obtained control or ownership of property owned by Stanley Erickson by the deception.

---

[5] These definitions of deception appear at Iowa Code section 702.9(1) and (2).

The court further instructed the jury to determine the degree of theft by finding the value of the property obtained—specifically, "Property valued more than $10,000 is First Degree Theft."

*a. Untrue Statements.* Fielder insists the State did not prove she made false statements to obtain money from Erickson. Part of its failure, Fielder continues, is the absence of proof regarding how Fielder spent the money if not for the stated purposes. But proof of how Fielder spent the money was not essential—so long as the State proved Fielder knowingly "creat[ed] . . . an impression as to the existence or nonexistence of a fact or condition which is false." *See Hogrefe*, 557 N.W.2d at 880.

Erickson testified Fielder repeatedly asked him for money, each time describing a different need—for instance, the cost of bail, to buy a house, to fix the furnace and frozen water line in that house, for her son's funeral, for another son's medical bills, and for her own cancer treatment. Viewing the evidence in the light most favorable to the verdict, we find substantial evidence in the record from which a reasonable jury could conclude Fielder knowingly created the impression for Erickson those conditions existed when she knew them to be false.[6] The jurors could have found Fielder obtained Erickson's money by concocting convincing stories of personal predicaments. *See id.* at 878 (describing theft by deception as "catch-all crime" intended "to encompass the full and ever changing varieties of

---

[6] Before wading into the evidence, we note "[i]t is peculiarly the province of the jury to pass upon questions of fact." *State v. Lowenberg*, 243 N.W. 538, 541 (Iowa 1932). "[T]he jury was free to believe or disbelieve the testimony of the witnesses and to give as much weight to the evidence as, in its judgment, such evidence should receive." *State v. Hunt*, 801 N.W.2d 366, 377 (Iowa Ct. App. 2011). "The very function of the jury is to sort out the evidence and place credibility where it belongs." *Id.*

deception"); *see also State v. Miller*, 590 N.W.2d 45, 47 (Iowa 1999) (upholding convictions of defendant who used misrepresentations of romantic intentions to "make her victims more vulnerable to misrepresentations of a financial sort").

On the need for bail money, Erickson testified he provided Fielder $4000 so she could repay "her sister or somebody" for bonding Fielder out of jail because "she stabbed her husband because he attacked her older son." But MFCU investigator Hoffa testified he searched Iowa court records but found no arrests for Fielder during that time period. Fielder also told Hoffa she had never gone to jail. The jury could fairly infer Fielder deceived Erickson regarding her need for bail money, resulting in theft by deception.

On her plans to buy a house: Erickson testified he gave Fielder "several thousand" dollars to help her with the down payment. But Hoffa testified he investigated the addresses where Fielder lived through this period and discovered all were rental properties. County assessor records showed neither Fielder nor her relatives purchased any of the homes in question. In her interview with Hoffa, Fielder agreed the properties were rentals. Fielder later told Erickson she needed money for repairs on the house she owned, but she would have known she had not actually purchased a house.

On funeral expenses for her son: Hoffa's investigation revealed no death notices for any of the children in Fielder's care. The record shows Fielder's biological son, who had been adopted by another family, did die during that time frame. According to Erickson, the burial was in Illinois. But Fielder did not tell Erickson why she would be responsible for the funeral expenses when the child

was no longer in her care. Erickson testified he did not remember how much he gave her for those expenses except for $100 in cash for transportation to Chicago.

On family medical expenses: Erickson testified Fielder told him another son had a severe seizure disorder and required hospitalization. She asked Erickson to meet her outside Blank Children's Hospital where Erickson gave her more money, though he did not recall the amount. Erickson did not see the son in the hospital. Hoffa testified Medicaid covered health care for Fielder, her wife, and their children. Hoffa found entries for doctor visits but no hospitalization records. He testified no alternative insurer would have paid the costs because if that had occurred, Medicaid would not have been billed. The jury could have reasonably inferred Fielder's statements about the medical bills were false.

On her cancer treatments: Erickson testified Fielder said she was treated in Iowa City and later at Mayo Clinic in Rochester, Minnesota. She claimed her insurance was not adequate to cover the costs. Erickson did not recall if Fielder asked him for money for this purpose. Hoffa investigated these claims and found no record of such treatment. Fielder's Medicaid record also revealed no billing for cancer treatments. The jury could have inferred Fielder provided Erickson false information about her medical condition.

When viewed in the light most favorable to the State and allowing all reasonable inferences, substantial evidence supports the jury's finding that Fielder knowingly made many false statements to Erickson about why she needed money. The jurors were entitled to assess the credibility of the reasons Fielder gave, in light of Hoffa's investigation. In each instance, she convinced Erickson to give her money on a premise the evidence later showed was not true or could not be

verified. Fielder created the false impression she needed help with specific financial crises. The jury could reasonably have inferred from Hoffa's investigation Fielder knew her claims were false when she shared them with Erickson.

*b. Causation.* Fielder also maintains the State failed to prove the false statements *caused* Erickson to give her money. We think Erickson's testimony satisfied this element.

He told the jurors he wrote checks or withdrew cash because Fielder convinced him she "needed it" for various emergencies. Erickson felt indebted to Fielder because she took good care of his late wife. But the transactions were not unsolicited gifts—Fielder asked Erickson for money tied to specific causes, and Erickson believed she was "in dire need." Thus, the jury could have reasonably concluded the elaborate statements prompted Erickson to give Fielder the money.

*c. Degree of Theft.* Fielder next assails the jury's finding that the amount Fielder stole was more than $10,000. In her estimation, "[T]he State would have had to have produced evidence that each individual reason for needing money given to Erickson was false." The State did not, she insists, "tie any individual transaction that was linked to any particular statement to a date or amount of money Erickson gave to Fielder, much less all of them."

To convict her of first-degree theft, the jury was required to find more than $10,000 in stolen money, but the jury did not need to find her theft entailed the entire $104,500 the State alleged she received from Erickson. *See* Iowa Code § 714.2(1) (defining theft in the first degree). Because Erickson's memory was imperfect as to the how much money he gave Fielder on any given occasion or for any stated reason, the nexus between her deceptive statements and the amounts

transferred is not crystal clear. But, we find substantial evidence in the record to connect at least $10,000 worth of transactions to particular false statements Fielder made to induce Erickson to give her money.

Erickson's testimony featured only one specific amount—$4000 he gave Fielder to repay someone who allegedly posted bail on her behalf. He also recalled giving her another "several thousand" dollars for a down payment on a house. Although the record does not reveal the precise amounts Erickson gave Fielder for home repairs, funeral expenses, or medical costs, it is reasonable to conclude Fielder's false representations about such expenditures would have bumped the total in transfers to more than $10,000.

Given the frequency with which Fielder made false statements about her need for money, the jury could have reasonably concluded Fielder engaged in an ongoing pattern of conduct to take money from Erickson under false pretenses. The State points out during the ten-month period Fielder solicited assistance from Erickson, he was giving her cash and writing her checks at a rate of more than $10,000 per month. The jury could reasonably conclude Fielder's theft surpassed the $10,000 threshold given the number of times Erickson transferred money by cash or check to Fielder (Hoffa identified twenty checks totaling $54,800 and fourteen cash deposits totaling $22,795 with matching deposits into Fielder's bank account) and the amount of money—$77,595. The jury's verdict on theft by deception in the first degree is supported by sufficient evidence in the record.[7]

---

[7] Fielder mentions a weight-of-the-evidence claim without supporting argument. We review denial of a motion for new trial asserting the verdict is contrary to the weight of evidence for an abuse of discretion. *Benson*, 919 N.W.2d at 241. The court abuses its discretion when it "exercises its discretion on grounds clearly untenable or to an extent

### 2. Tampering with a Witness.

Fielder next contends insufficient evidence supported her conviction for tampering with a witness. The court instructed the jury on these elements:

> 1. On or about November 19, 2016, the defendant did offer a bribe to Stanley Erickson.
> 2. The defendant believed Stanley Erickson had been or may be summoned as a witness or juror in any judicial proceeding.
> 3. The defendant acted with the intent to improperly influence Stanley Erickson with respect to his testimony or to prevent Stanley Erickson from testifying in such case.

The instructions did not define "bribe." Our case law describes a bribe as "an offer of anything of value or benefit to induce another to act improperly." *State v. Halleck*, 308 N.W.2d 56, 58 (Iowa 1981).

Fielder argues she did not bribe Erickson or ask him to lie under oath, though she admits trying to convince him not to "press charges." She notes, "[H]e was never the one to 'press' charges," and we agree—the State brings charges and its key witness was Erickson. Fielder's meeting with Erickson was an attempt to convince him not to participate in the prosecution. She had him sign a statement indicating they always intended for Fielder to repay the money, though Erickson

---

clearly unreasonable" such that the decision "is not supported by substantial evidence or . . . is based on an erroneous application of the law." *Id.* (quoting *Wickes*, 910 N.W.2d at 564). "A verdict is contrary to the weight of the evidence only when a greater amount of credible evidence supports one side of an issue or cause than the other." *Id.* (internal quotations omitted). "A district court should only grant a motion for new trial in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.* (edited for readability).

The district court did not abuse its discretion when denying Fielder's motion for new trial because the verdicts were not contrary to the weight of the evidence. Erickson, though a somewhat reluctant witness against Fielder, was credible as to his recollections. Hoffa conducted a sound investigation, and Fielder's denial of the statements and explanation Erickson would not accept repayment rang false. The State also presented exhibits showing thirty-one deposits of cash and checks into Fielder's bank account and the tally of more than $100,000 transferred in less than one year, convincing us the weight of the evidence preponderates heavily in favor of the verdicts rendered.

testified that was not the case. She also asked him to document a lack of deception in his decision to help her financially, though he previously suspected she was not being truthful.

Erickson testified he thought the $20 Fielder gave him during their meeting on November 29, 2016, was a good faith attempt to begin paying him back. Still, the jury was entitled to believe Fielder's offer to pay him back and her $20 initial payment was an attempt to improperly influence Erickson not to testify or to constrain the State to dismiss the charges.

The jury was also entitled to believe Fielder's $20 payment constituted an improper inducement for Erickson to act according to her wishes. Fielder points to *State v. LaPointe*, where the supreme court concluded proof of an offer of money with "the intent to deter a victim from signing a complaint or causing a criminal complaint to be filed" did not amount to tampering with a witness. 418 N.W.2d 49, 52 (Iowa 1988). But the timing here is different. The State had already filed theft charges, and Fielder made her initial appearance. The jury could reasonably have concluded Fielder's conduct was not an attempt to settle a personal dispute before criminal charges were filed by making the victim whole, rather, it was an attempt to frustrate the ongoing prosecution.

Fielder further points out language in *LaPointe* that the money offered as alleged restitution—$10,000 in that case—was so excessive it should be considered a bribe. *Id.* By contrast, she urges that her $20 payment to Erickson was too miniscule to suggest an intent to improperly influence him. Fielder's reasons fail on two levels. First, in *LaPointe*, the court called the State's desired inference from the amount of the offer "strained." *Id.* Second, in this case, the jury

could have found the amount immaterial because Fielder was not in a position to make a substantial payment to Erickson. In short, a $20 bribe is still a bribe. The statutory definition also embraces "anything of value or benefit," which could embrace a good faith down payment with a promise of future fulfillment of the entire obligation.

We also find it significant that Fielder made no further reimbursements to Erickson after that first $20. Nor did she pay the note on the Dodge Durango. In *Halleck*, our supreme court found a defendant's offer to make restitution on the condition the victims would "change their position and testimony from favorable prosecution to not pressing prosecution of the charge" constituted a bribe. 308 N.W.2d at 58. The court cautioned it was not discouraging offers of restitution, which are not in themselves a crime. *Id.* at 59. But, "the legislature intended to make it a crime to offer restitution where the person making the offer attempts to improperly influence a victim-witness's testimony." *Id.* Based on the circumstances and timing of the Walmart meeting, the language of Fielder's handwritten statement, and Erickson's role as the theft victim in the pending prosecution, we conclude substantial evidence supported the verdict finding Fielder tampered with a witness.

### C. Motion to Suppress

Fielder next contends the district court erred in denying her motion to suppress the evidence from her bank records obtained by administrative

subpoenas.[8]   She advances this argument on both statutory and constitutional grounds.[9]   We review a motion to suppress on state or federal constitutional grounds de novo.  *State v. Smith*, 919 N.W.2d 1, 4 (Iowa 2018).  When suppression is urged on statutory grounds, we review for correction of errors at law.  *State v. Werner*, 919 N.W.2d 375, 377 (Iowa 2018).  We will affirm if the court correctly applied the law and substantial evidence supports the court's fact-finding.  *Id.*

Fielder takes issue with the initial DIA subpoena for her bank records turning up deposits investigator Conner testified were "cause for concern."  Based on that concern, Conner referred the information to the MFCU for further investigation. Fielder complains, "[I]nformation obtained by agencies of the executive branch by subpoenas issued . . . pursuant to Iowa Code section 10A cannot be combed for unrelated information and then sent to law enforcement."  She asserts an agency subpoena is not an administrative search warrant and, under the federal and state constitutions, the subpoenas constituted a warrantless search without an applicable exception.  *See State v. Gaskins*, 866 N.W.2d 1, 7 (Iowa 2015) ("A warrantless search is presumed unreasonable unless an exception applies." (internal quotation marks omitted)); *see also* Iowa Const. art. I, § 8; U.S. Const. amend. IV.  Fielder also argues the administrative subpoena usurps the judicial

---

[8] The motion to suppress was submitted on written briefs only; the parties identified no factual disputes; the court held no hearing and took no additional evidence, but denied the motion.

[9] The State mentions Fielder did not renew her objections to the bank statements at trial. *See State v. Alberts*, 722 N.W.2d 402, 406 (Iowa 2006) ("Ordinarily, error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial.") (quoting *State v. Tangie*, 616 N.W.2d 564, 568–69 (Iowa 2000)).  But because the State makes no further preservation argument, we will assume Fielder preserved error.

power to determine when a search is proper and constitutes a violation of the separation-of-powers doctrine.

The DIA director and designees have statutory authority to "[i]ssue subpoenas and distress warrants, administer oaths, and take depositions in connection with audits, appeals, investigations, inspections, and hearings conducted by the department."  Iowa Code § 10A.104(6).  If the information in the DIA's possession "indicates that a criminal offense may have been committed, the information may be reported to the appropriate criminal justice or regulatory agency." *Id.* § 10A.105(5); *see also* Iowa Admin. Code 481-73.7(2).

Our supreme court has approved the use of administrative subpoenas and "construed broadly the right of an agency to conduct preliminary investigations and issue administrative subpoenas in the field of public interest assigned to it." *Iowa City Human Rights Comm'n v. Roadway Express, Inc.*, 397 N.W.2d 508, 510 (Iowa 1986).  Administrative agencies may investigate matters within their purview, "merely on the suspicion that the law is being violated, or even just because it wants assurances that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950).  Further, "[w]hen investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law." *Id.* at 643.  Fielder cites no authority supporting the proposition that an administrative agency runs afoul of constitutional prohibitions on unlawful search and seizure when its investigators legally discover evidence suggesting criminal conduct and turn the results over to law enforcement.

In the absence of any authority to the contrary, we decline to grant relief on Fielder's novel suppression claim.  Fielder cannot show the bank records were the

fruit of an illegal search because the DIA investigator had statutory authority to obtain the evidence through administrative subpoena and to share it with law enforcement. Fielder's separation-of-powers argument also fails. *See id.*, 338 U.S. at 642 (explaining agencies have the "power of inquisition" which is "not derived from the judicial function"). The district court properly denied the motion to suppress.

### D. Evidentiary Rulings

Fielder next seeks a new trial based on the jury's exposure to improper evidence. We review most evidentiary rulings for an abuse of discretion. *State v. Einfeldt*, 914 N.W.2d 773, 778 (Iowa 2018). The district court abuses its discretion when it exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (quoting *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003)). When it comes to the hearsay claims, our review is for correction of errors at law. *See In re Det. of Tripp*, 915 N.W.2d 867, 873 (Iowa 2018). We review claims based on the confrontation clause de novo. *State v. Newell*, 710 N.W.2d 6, 24 (Iowa 2006).

*a. Spurgeon Manor Employee Handbook.* The State notified defense counsel it planned to offer the Spurgeon Manor handbook into evidence through administrator Cahill's testimony. The handbook included the following explanation of the care center's policy on "borrowing" money from residents:

> Theft
>
> Theft from a resident is a form of abuse and will be investigated in the same way as other types of abuse. Theft can take several forms. It may be the usage of the resident's possessions without permission, "borrowing" money, or coercing a resident to buy something for another's use. The use of resident's telephone is

considered theft as is borrowing medication from one resident for another. All reported theft will be taken seriously.

Defense counsel objected to the contents as irrelevant and "a misstatement of the law" on theft. The State argued the document was admissible to show Fielder's "knowledge and lack of mistake and planning." The district court allowed the State to offer the handbook into evidence, reasoning:

> I think the document could be relevant to show knowledge and intent to deceive, which are elements of the theft charge as made in this case. And I don't think it's unduly prejudicial because we can take steps in the written instructions to ensure that the jury will know that the legal definition governing this case will be as set out in the marshaling instruction.

When questioned by the prosecutor, Cahill testified she reviews the handbook with new employees at orientation, they are given an opportunity to read the whole document, and then "they sign that they understood the contents." She testified she wrote the handbook with the help of an attorney. Cahill also testified policies are in place at Spurgeon Manor regarding the acceptance of gifts or loans from clients. She referred to the particular page of the handbook that addressed "gifts" and "theft"—telling the jury: "We don't allow our staff to accept any gifts."

During closing arguments, the State returned to the topic of the handbook:

> Ladies and gentlemen of the jury, Chaka Khan Fielder was trusted. She was trusted by Spurgeon Manor, hired to perform care for residents. She was put in a position of power. She was a caretaker to Ms. Erickson. Because she was in that position, there were specific rules put in place that she knew about, that she was not to take anything from a resident at Spurgeon Manor.
> Exhibit 10, a handbook. And as testified to by Maureen Cahill, the administrator of Spurgeon Manor, on page 8 there is a specific policy regarding theft. And there was certainly an understanding by all staff they were not to take anything, not even to borrow money. That was a policy at Sturgeon Manor. She knew it. She was trusted by Spurgeon Manor.
> She was also trusted by Stanley Erickson.

On appeal, Fielder alleges the handbook was both irrelevant and more prejudicial than probative in labeling Fielder's conduct a form of "abuse" and in supplying an alternative version of theft not consistent with Iowa law. She asserts the prosecutor's closing argument compounded the district court's error in admitting the handbook.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. Irrelevant evidence is inadmissible. Iowa R. Evid. 5.402. "The general test of relevancy is whether a reasonable person might believe the probability of the truth of the consequential fact to be different if the person knew of the proffered evidence." *State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014) (edited for readability).

Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. We accord "a great deal of leeway" to the district court in this weighing exercise. *Putman*, 848 N.W.2d at 9 (quoting *Newell*, 710 N.W.2d at 20–21). To require reversal, an evidentiary error must affect "a substantial right of the party." Iowa R. Evid. 5.103; *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008).

We start with the question of relevance. On appeal, Fielder argues there was "no legitimate reason for the State to offer the handbook." Nothing in the handbook "touched on any" of the disputed issues, and Fielder never provided

nursing services to Stanley Erickson.  In briefing, the State argues because Fielder was once an employee and was warned against accepting anything from residents, the handbook "went to her knowledge, lack of mistake, and planning." But, in oral argument, the State conceded the handbook was not relevant.

The trial information alleged Fielder committed the theft "on or about August 11, 2015[,] through July 31, 2016."  Fielder stopped working at Spurgeon Manor in January 2016, so the relevance of the handbook, if any, fades from that date on.  But, even for the months she did work at Spurgeon Manor, we fail to see how the handbook—and its peculiar definition of theft—makes any fact of consequence to the prosecution more probable than if the jury did not have the information.  It is unclear how Fielder's familiarity with the policies in the handbook makes it more likely she knew her statements were false or she had the intent to deceive Erickson.

Her awareness of the Spurgeon Manor policies did not increase the likelihood she knowingly deceived Erickson to obtain the money.  At most, her exposure to the handbook made it more likely she knew asking a resident for money could violate her employer's policies.  But her awareness of a workplace violation was not an element of the offenses or otherwise a disputed issue.  Nor did Fielder's familiarity with the handbook make it more likely she planned to deceive Erickson.  Perhaps the handbook helped the State show Fielder schemed to avoid detection for a workplace violation, but such avoidance was not a material issue in the prosecution.  Nor does the evidence show any particular planning to

avoid detection by the employer.[10]  The employer's policies were irrelevant and, therefore, inadmissible.  The district court's admission of the handbook constituted an abuse of discretion.

Even if the handbook was relevant, its admission contravened Rule 5.403 as it was unfairly prejudicial and confused the issues.  The salient facts of the case involved the State accusing a person who provided nursing care to elderly residents of taking advantage of the kindness and naivety of a grieving spouse of one of those residents.  Against that factual backdrop, admitting into evidence an alternative definition of theft that broadly encompassed non-criminal conduct risked confusing the jury as to the elements of the crime.  That risk was intensified when the prosecutor in closing argument pointed to the Spurgeon Manor theft policy as an example of Fielder's violation of trust.

On top of introducing an alternative definition of theft, the handbook and the prosecutor's statements planted the notion with the jurors that Fielder's conduct constituted "abuse"—particularly, "dependent adult abuse"—when that separate criminal offense was not at issue.[11]  By motion in limine, Fielder successfully asked

---

[10] The State points out Fielder sometimes had Erickson meet her at Walmart or Love's gas station.  Erickson testified it was always to deliver her money, but he also said their discussions primarily took place in his private apartment at Spurgeon Manor.  The jury could have inferred this arrangement was an attempt to conceal the money exchange from Spurgeon Manor staff, but that inference is weakened by the fact Fielder stopped working there and most of the alleged deception occurred at Spurgeon Manor.

[11] A "dependent adult" is a person eighteen years of age or older who is "unable to protect the person's own interests or unable to adequately perform or obtain services necessary to meet essential human needs, as a result of a physical or mental condition which requires assistance from another."  Iowa Code § 235B.2(4).  Dependent-adult abuse is—in relevant part—defined as "[e]xploitation . . . taking unfair advantage of a dependent adult or the adult's physical or financial resources for one's own personal or pecuniary profit, without the informed consent of the dependent adult, including theft, by the use of undue influence, harassment, duress, deception, false representation, or false pretenses.  *Id.* § 235B.2(5)(a)(1)–(3).  A "caretaker" is a "person who has the responsibility for the

the court to exclude all references to "dependent adult abuse." Nonetheless, the handbook stated, "Theft from a resident is a form of abuse."[12]

We find admission of the handbook crossed into the sphere of unfair prejudice. Unfairly prejudicial evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *State v. Martin*, 704 N.W.2d 665, 672 (Iowa 2005) (quoting *State v. Rodriguez*, 636 N.W.2d 234, 240 (Iowa 2001)). We understand violation of trust was part of the State's story of the case. But whether Fielder violated the employee policy was not a fact of consequence—so highlighting the internal theft policy and linking it implicitly with "dependent adult abuse" unfairly appealed to the jurors' sympathy for a recently bereaved, older man and provoked a generalized instinct to punish a person holding a position of trust who took advantage of such a vulnerable person. At the same time, the handbook had no probative value. Thus, the danger of unfair prejudice substantially outweighed the probative value of the handbook.

Under these circumstances, we assume prejudice unless the record affirmatively establishes otherwise. *See State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004) ("[I]n a harmless error analysis where a nonconstitutional error is claimed, under rule 5.103(a) we presume prejudice . . . and *reverse* unless the

---

protection, care, or custody of a dependent adult as a result of assuming the responsibly voluntarily, by contract, through employment, or by order of the court." *Id.* § 235B.1(1).

Based on these definitions and the factual circumstances, Stanley Erickson was not a "dependent adult," nor was Fielder his "caretaker," so a prosecution for "dependent adult abuse" was not possible in this case.

[12] In discussing the nursing home's "Abuse Policies" on pages 7–8, the also handbook mentioned dependent abuse.

record affirmatively establishes otherwise."). Here, the record does not show improper admission of the handbook was harmless. The evidence supporting the verdicts was not overwhelming. *See State v. Trudo*, 253 N.W.2d 101, 108 (Iowa 1977) (finding evidentiary error was not prejudicial when the defendant conceded the evidence or the same evidence was overwhelmingly clear on the record). Therefore, we find reversal of both convictions necessary.

*b. Motion for Mistrial.* In fact, the prejudicial nature of the handbook was compounded by the State's violation of the court's ruling on Fielder's motion in limine during administrator Cahill's testimony. The prosecutor asked Cahill: "Are there policies in place at Spurgeon Manor regarding acceptance of any kind of gifts or other loans, anything like that from clients to staff?" Cahill responded: "Yes." When asked to describe those policies, Cahill answered: "Well, it's part of dependent adult abuse and so . . . ." Defense counsel objected. After the court sustained the objection, Cahill explained that staff is not allowed to accept gifts or cash from the residents and directed the jury to the page of the handbook defining theft as "abuse" of the residents.

Outside the presence of the jury, defense counsel asked for a mistrial based on Cahill's reference to dependent-adult abuse. The court denied the motion but offered to instruct the jury that Stanley Erickson was not a dependent adult and the State was not alleging abuse, if the defense proposed such an advisory instruction.[13] Fielder cites the denial of her motion for mistrial as another ground

---

[13] It does not appear the defense asked for a cautionary instruction on dependent adult abuse, and the court did not issue such an instruction on its own accord.

for reversal. We find the improper admission of the handbook, exacerbated by the violation of the motion in limine, demands a new trial.

*c. Tape-Recorded Interview.* The specter of elder abuse also arose in statements made by investigator Hoffa in his interview with Fielder, which Fielder asserts were erroneously played for the jury. Hoffa accused Fielder of taking money from "an old man." Fielder also objects to Hoffa's assertions on the recording that Fielder told the same "stories" to "other people"—alleging hearsay and Confrontation Clause violations. Because use of this recording will likely be an issue on retrial, we address Fielder's complaints in this appeal. *See Kinseth v. Weil-McLain*, 913 N.W.2d 55, 73 (Iowa 2018). Considering Hoffa testified and was subject to cross examination, we find no confrontation clause violation. *See Crawford v. Washington*, 541 U.S. 36, 59 n. 9 (2004) ("The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").

As for hearsay, the State does not deny Hoffa's allusion to hearing stories from other people was an out-of-court statement offered for the truth of the matter asserted. *See* Iowa R. Evid. 5.801(c) (defining hearsay). Rather, the State contends the mention was "brief" and a common law-enforcement tactic. On remand, the tape should be redacted to delete Hoffa's reference to the extrajudicial statements of "other people." We find no basis to exclude Hoffa's reference to Erickson as an "old man."

## III.    Summary

To recap, viewing the evidence in the light most favorable to the jury's verdicts, we find sufficient evidence of theft by deception in the first degree and

tampering with a witness. We also believe the district court properly denied the motion to suppress. But we find an abuse of discretion in the admission of the employee handbook, which was not probative of any material issue in the prosecution and stood to confuse the jury by offering an alternative definition of theft. When coupled with the administrator's reference to dependent adult abuse, we find these evidentiary errors were unfairly prejudicial to Fielder's defense. We reverse the judgment of the district court and remand for a new trial on the theft by deception and tampering charges.[14]

**REVERSED AND REMANDED.**

---

[14] Having resolved the appeal on the evidentiary issue, we need not address Fielder's claims of ineffective assistance of counsel or her challenge to the restitution order.

**TABOR, Presiding Judge** (concurring in part and dissenting in part)

I agree with the majority's decision to reverse based on the admission of irrelevant and unfairly prejudicial evidence. But I respectfully dissent from the majority's conclusion the State offered sufficient evidence to prove the amount of money Fielder obtained by deception surpassed $10,000. The State must prove the value of the stolen property beyond a reasonable doubt. *See State v. Savage*, 288 N.W.2d 502, 508 (Iowa 1980). In its case against Fielder, the State fell short of that burden of proof for theft by deception in the first degree.

In her opening statement, the prosecutor previewed a gestalt approach to the valuation evidence, eschewing the need to link particular untrue statements to particular money transfers: "[O]ver the course of a year or so, she was able to get around $100,000 out of Mr. Erickson for all these different reasons she gave." In his testimony, Erickson repeatedly said he could not remember how much money he gave Fielder for any specific need she articulated. For example, the amount he estimated he gave her for a house down payment was a "few thousand." The single precise amount he remembered was $4,000 for bail money. Investigator Hoffa testified that in looking at Erickson's bank withdrawals and Fielder's deposits, he could not "correlate a dollar figure with a story" told by Fielder.

In its motion for judgment of acquittal, the defense argued,

> There's no evidence to suggest that any one of these alleged deceptions resulted in an amount that was beyond . . . $10,000 or that the aggregate of the stories that they provided is in excess of $10,000. . . . [T]he records suggest that the amount that Ms. Fielder received was over $10,000. But Mr. Hoffa testified specifically there's no way to attach any one of these deposits to any specific particular story.

The district court denied the motion, reasoning:

> This was of course a conduct that continued on over several months and that those actions, providing those amounts of money, would easily exceed $10,000. Even if a jury found that not all of these statements made by Ms. Fielder were false, the jury could still find that a number of them were and find that the aggregate dollar amount exceeded the $10,000 amount to apply to a first degree theft.

The majority accepts that same course-of-conduct rationale and overlooks the concern Erickson could not remember all of the reasons Fielder might have given him for needing money or—with the exception of the bail-money—the amounts he gave her for the reasons he did recall.

In my view, when faced with the heavy burden to prove all elements of a criminal offense beyond a reasonable doubt, the State needed to be more precise to convict Fielder of first-degree theft by deception. Fielder's untrue statements were the gravamen of the knowing deception. If Erickson gave her money based on a reason that was true, or that the State did not prove was false, the corresponding amount cannot be counted toward the $10,000 plus in stolen funds. Maybe Fielder was truly in "dire need" of money as Erickson believed; or maybe Erickson was just generous as Fielder suggested. Hoffa did not prove the falsity of all of Fielder's reasons for needing money. For example, Fielder may have needed a car as she said; she may have needed money to travel to her son's funeral in Illinois. In my view, the State's case was insufficiently precise as to the dollar amount Fielder obtained by lying. Without showing Fielder collected a certain amount of money based on certain false information, the State did not prove the payments were obtained by deception. *See State v. Tovar*, 580 N.W.2d 768, 771 (Iowa 1998) (reversing theft by deception conviction where State did not

prove Tovar obtained customers' money by creating "false belief" he would apply down payments to buy carpet).

Because the State offered substantial evidence in the first trial that Fielder obtained more than $1,000 but less than $10,000 from Erickson by deception, I would remand for retrial only for second-degree theft by deception. *See* Iowa Code § 714.2(2) (2016) (defining second-degree theft).