# IN THE COURT OF APPEALS OF IOWA

No. 18-0209
Filed November 27, 2019

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**JAMES RUSSELL WALDEN JR.,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

      The defendant appeals from his conviction for murder in the first degree.

**AFFIRMED.**

      Randall L. Jackson of Law Office of Randall L. Jackson, Des Moines, for appellant.

      Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.

      Heard by Doyle, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Sheila Keenan died after suffering twenty-six blunt force wounds to her head including two that fractured her skull and caused severe brain hemorrhaging. James Walden Jr. appeals the jury verdict finding him guilty of first-degree murder in Keenan's death. Most of his appellate claims focus on the State's failure to identify a specific murder weapon. For instance, he contends the district court erred in allowing the jury to infer his intent from the use of a dangerous weapon. He further contends the verdict is unsupported by sufficient evidence and is against the weight of the evidence. He also contends his trial counsel rendered ineffective assistance by asking about the weapon on cross-examination. In an unrelated issue, he contends the district court erred in admitting evidence related to sexual assault that was excluded under a pretrial ruling.

On that last issue, we find the district court's remedy for the accidental admission of sexual assault evidence did not prejudice Walden. On the weapon claims, we find the court properly instructed the jury regarding inferences from the use of a dangerous weapon. And the court appropriately overruled Walden's motions for judgment of acquittal and new trial. We preserve the ineffective-assistance-of-counsel claim for possible postconviction-relief (PCR) proceedings.

## I. Facts and Prior Proceedings

Before her violent death, Keenan lived with her boyfriend, Famous Grady, at the southeast Des Moines home of her sister and brother-in-law, Claudia and James Sadler. Keenan and James were friends with Jeremy Snyder. In early

March 2017, Keenan spent a few days at Snyder's apartment downtown.[1] On March 6, Keenan socialized at Snyder's apartment with Walden and Kelly Coleman, who is Snyder's friend and Keenan's cousin. Snyder left the apartment around noon to work on his car, which was parked on the street out front. The others stayed in the apartment, watching television. Coleman headed home mid-afternoon. Meanwhile, Snyder's friend, Gary Johnson, who also lived in the building, joined him out front. Snyder turned his attention to the bent fender on Johnson's car.

Around 5:00 p.m., Snyder and Johnson decided they needed to pick up tools and supplies. Before leaving Snyder ducked into his apartment and saw Keenan and Walden watching television.

Also that afternoon, Brian Jeffries came to Snyder's apartment looking for his fiancée, Stacy, whom he knew to frequent several apartments in the building. Jeffries met Snyder through Stacy. Jeffries did not remember the exact time he knocked on Snyder's door but recalled it was dark outside. No one answered his knock at first. But eventually someone asked who it was, and Jeffries responded, "Brian." Jeffries knew Walden, who opened the door. Walden was wearing "his Chicago Bulls hat that he normally wears." Jeffries asked if Stacy was there, and Walden said no. Walden told Jeffries "he rented the apartment from Jeremy . . . so he could have time to sleep with the girl in there." Jeffries had no reason to believe the girl was Stacy, so he left.

---

[1] Several witnesses suggested she spent the weekend with Snyder abusing drugs. And a toxicology report on Keenan's body was positive for methamphetamine, marijuana, and cocaine.

About forty minutes later, Jeffries returned.  This time, when he knocked on Snyder's door, Walden stepped out.  A drunken neighbor joined them, and Walden "told us to get the hell out of there and just take off.  He was serious.  He was just wanting us to leave."  Walden did not have his Bulls hat on anymore and "looked glazed, glossy, like he'd been sweating a little bit."  Jeffries added, "To me it looked like he was—like—I don't know.  Like you would if—after you—you know, you've been with a woman."  Jeffries said to Walden, "You wouldn't hurt me, would you? I'm your friend."  And Walden said, "No, I wouldn't but I want you to leave."  Jeffries left and did not return that night.

Meanwhile, Snyder and Johnson were running errands around town.  They returned between 8:00 and 9:00 p.m. and continued working on Johnson's car. Later they went upstairs to Snyder's apartment.  Walden answered, wearing shorts and no shirt; he had a white t-shirt slung over his shoulder.  Snyder entered, while Johnson stood outside the door and eventually went back to his own apartment.

In the apartment, Snyder saw Walden wiping what appeared to be blood onto his white t-shirt.  Walden told Snyder "he had to knock her out because she was in his pockets."  As Snyder walked into the apartment and turned a corner, he saw Keenan face down on the floor with blood around her head.  Walden was standing between Snyder and the exit.  Snyder feared for his own safety.  So he grabbed his dog from its kennel and told Walden, "I'm going to take my dog outside, and then let's get this figured out."  Walden gave Snyder "a bro hug," and told him he was "the only one he could trust."  Snyder left for Coleman's place, but Coleman was not there.  So Snyder tried to find Coleman at the Sadlers' house.

After returning to his own apartment, Johnson stepped into the stairwell and saw Walden walking up the stairs. Johnson thought Walden was coming from the trash area or laundry room. Walden carried trash bags.

Meanwhile, Snyder found Coleman at the Sadlers' house. They drove back to Snyder's apartment with Claudia, James, and Grady following in a separate vehicle. Snyder handed Coleman the apartment key, and Coleman and James went upstairs. They saw Walden "just standing there" in the apartment. Coleman saw Keenan laying face down on the floor. He asked Walden, "What the fuck happened?" Walden's only response was, "Where's Jeremy?" Coleman left and called 911. Walden tried to make a run for it, but Coleman and James waylayed him until a police officer arrived and took him into custody. When he was arrested, Walden was wearing a black Chicago Bulls shirt and a pair of Snyder's jeans.

The State charged Walden with murder in the first degree. *See* Iowa Code § 707.1, 707.2(1)(a) (2017). At his jury trial, the State presented the testimony of several witnesses who interacted with Walden that day. In addition to those witnesses, a criminalist with the Iowa Division of Criminal Investigations (DCI) testified about the physical evidence. A garbage bag inside the apartment contained three bloody articles: a grey sweatshirt, a navy-blue sweatshirt, and a pair of black sweatpants. The DNA on the sweatshirts matched Keenan's profile. The DNA on the sweatpants came from two individuals but the major—and only discernable—contributor was Keenan. Seminal fluid on the sweatpants did not match any known contributors in the case. Investigators found another set of clothing in the laundry room. A pair of worn, dirty, khaki pants stained with blood contained DNA matching the profiles of Walden, Snyder, and Keenan. Snyder

later identified these as his khaki pants.  A Nike t-shirt had a mixture of DNA from three individuals but only Walden's was detectable.  And a green fleece jacket contained no testable stains.  Law enforcement never recovered a white t-shirt.

Retired Polk County Medical Examiner Francis Garrity[2] testified to the aftermath of the brutal attack on Keenan.  He described how Keenan had twenty-six "abraded lacerations" around her head and face.  Dr. Garrity defined "abraded lacerations" as "injuries as a result of a crushing force, crushing in the sense that the object used contacts the skin and then causes it to split."  He further explained, "In the case of an abraded laceration, the instrument used hits the skin and causes an abrasive injury on both sides of the wound."  Those fractures would have caused considerable hemorrhage in the brain and significant blood loss.  Two blows resulted in underlying skull fractures.  One broke her jaw.

Referencing the jaw fracture, Dr. Garrity also noted an injury to Keenan's lips saying, "[T]here was an extensive fracture of the maxilla horizontally across the face. . . .  One could actually separate the top from the bottom of the maxilla.  A large fracture associated with this particular blow."  The prosecutor asked, "[D]o you have any idea of the amount of force necessary to do something like that?"  Dr. Garrity explained, "[I]t's difficult to say but it would be considerable, given the extent of the fracture to the maxilla.  The maxilla is a fairly firm bone."

---

[2] Although retired, Dr. Garrity maintains his medical license and is occasionally called to "fill in for" the current medical examiner.  He served in that capacity during this case.

Dr. Garrity explained other compound[3] injuries and stated, "[I]n my mind or in my opinion, [they] are the result of multiple blows in that particular spot." Then he explained that where an instrument crushes the skin's surface, as well as the underlying tissue, "causing a bridging from one side of the wound to another . . . That's the hallmark of an abraded laceration."

The medical examiner also chronicled an array of other injuries. Keenan had a black left eye and bruising around the face. The autopsy also revealed defensive wounds, for instance, bruising on the back of her left hand. She also had blood smear and spatter on her right hand. An area on her lower back also reflected "very significant blunt force trauma" that resulted in "substantial subcutaneous and intramuscular hemorrhage." Comparing these findings to "sharp force" injuries inflicted by a knife, Dr. Garrity said, "[C]onsiderable force had to be applied to the surface of the skin to cause it to breach and to tear." Dr. Garrity found the cause of death to be "multiple blunt force injuries to the head" and the manner of death to be "homicide."

In the performance challenged on appeal, defense counsel cross examined Dr. Garrity about the missing murder weapon: "[Y]ou can't really speculate what the object was, but it would have been something of substance or thickness; correct?" Dr. Garrity said, "Right." Defense counsel also asked Dr. Garrity about the blood splatter evidence. Dr. Garrity explained, "Back splatter relates to the spray or discharge of blood from an instrument that is indeed bloody. As the

---

[3] Dr. Garrity explained compound injuries as "represent[ing] several abraded lacerations, one on top of the other. . . . [W]e generally describe those in forensic terms as compound injuries, multiple fractures, maybe one or two blows."

instrument is being wielded in space . . . blood would basically spatter off." And again counsel clarified, "[I]t would have been an instrument of some significance, meaning thickness?" to which Dr. Garrity replied yes.

At the close of the State's evidence, Walden moved for judgment of acquittal arguing insufficient evidence of malice aforethought, premeditation, and specific intent. Walden emphasized the State's failure to produce a murder weapon. Walden also objected to an instruction telling the jury it could infer malice from the use of a dangerous weapon. The court rejected Walden's complaint about the dangerous-weapon instruction:

> I think it's close. . . . I think the question or questions that [Walden] posited [to the medical examiner] in trying to infer that he could not identify a specific instrumentality that was used prompted a response that some instrumentality was used, and I think that is—I think that's adequate.[4]

The court also overruled Walden's motion for judgment of acquittal. The jury returned a verdict finding Walden guilty of first-degree murder. Walden appeals.

## II. Analysis

Walden raises five claims on appeal.

- The district court abused its discretion in not declaring a mistrial when a State's witness introduced the topic of sexual assault.

- The district court erred by instructing the jury it could infer malice aforethought from the use of a dangerous weapon.

- The verdict is not supported by substantial evidence the dangerous weapon existed or was used.

- The verdict is against the weight of the evidence.

- Trial counsel was ineffective in bringing up the weapon in cross-examination.

---

[4] The court added, "[A]nd now you've gotten an appeal issue."

We will address each issue in turn.

## A. Sexual assault evidence

Before trial the defense asked the court to prohibit witnesses "from making statements that insinuate or speculate that . . . Walden sexually assaulted Sheila Keenan." The State agreed to "instruct witnesses not to speculate about the defendant sexually assaulting the victim." But the State maintained its intent to present Jeffries's testimony that Walden said he was using the apartment to have sex with the woman inside. The defense was satisfied with the State's response, explaining its motion did not seek to exclude Jeffries's testimony on that issue.

Then, despite the State's agreement, Claudia Sadler volunteered on direct examination she told a police officer she "wanted to have a rape kit done" on her sister's body. The State did not inquire further about the rape kit. But Walden moved for a mistrial. The court found the prosecutor had not intentionally elicited that testimony and did not anticipate Claudia's response. Still, the court found a "clear violation" of the limine ruling. The court discussed possible prejudice:

> The inference that is now in the record is that there may have been a sexual component to the homicide with which Mr. Walden has been accused. There might also be an inference drawn from this record by reasonable people that there was some sexual liaison between the decedent and Mr. Walden.
> The Court has been informed prior to trial that in—there was a medical examination done of the decedent, indicating that she had not been sexually assaulted. And while I am not certain of this, Counsel can supplement the record as to whether or not the sexual assault kit even indicated that there was any sexual activity between the decedent and the defendant.
> Assuming that latter situation to be the case, if this inference is not remedied in the record, there is clear prejudice that would justify a mistrial. The question, then, is what remedy might be offered to prevent the type of prejudice that would justify a mistrial, which is the fourth stage of the analysis.

The suggestion that some type of curative instruction would address this, I think, is insufficient. . . .

The district court then ventured a possible solution:

If in fact the indisputable medical evidence shows, one, that the decedent was not sexually assaulted and that there was no sexual liaison between the defendant and the decedent, it seems to me that any adverse inference from the unintentional statement of Ms. Sadler can be ameliorated by the Government offering into evidence the undisputed evidence to that effect. That would make the record clear that this defendant did not have a sexual liaison with the decedent, this defendant did not sexually assault the decedent.

So my thought at this point is that, short of a mistrial, this problem can be remedied by having the State affirmatively offer the medical evidence, which is clearly exculpatory of the defendant.

The State later offered the rape kit into evidence. As part of its admission, the DCI criminalist testified no seminal fluid was present on oral, rectal, or vaginal swabs. A pubic hair comb revealed DNA from two contributors that was too weak for analysis. And blood found under her fingernails contained only Keenan's DNA.

On appeal, Walden contends the district court abused its discretion in denying his motion for mistrial. He argues the court's remedy did not ameliorate the unfair prejudice. He also asserts other statements throughout trial improperly implied sexual contact between him and Keenan. He insists he suffered undue prejudice by the admission of this evidence.

We review the denial of a motion for mistrial for an abuse of discretion. *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017). An abuse of discretion occurs when the court "exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable." *State v. Wickes*, 910 N.W.2d 554, 564 (Iowa 2018) (quoting *State v. Hill*, 878 N.W.2d 269, 272 (Iowa 2016)). Trial courts have broad discretion in ruling on motions for a mistrial. *State v. Brown*, 397 N.W.2d 689, 699

(Iowa 1986). We reverse only when that discretion "'was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Huser*, 894 N.W.2d 472, 498 (Iowa 2017) (quoting *State v. Brewer*, 247 N.W.2d 205, 211 (Iowa 1976)). To establish reversible error, Walden must show the violation of the limine order "resulted in prejudice that deprived [him] of a fair trial." *State v. Frei*, 831 N.W.2d 70, 80–81 (Iowa 2013), *overturned on other grounds by Alcala v. Marriot Int'l Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016).

Walden contends the error went beyond Claudia's inadvertent testimony.[5] He complains the State persisted throughout trial in "inferring a sexual act" which "creat[ed] the improper and unsupported inference that a Defendant predisposed to violence to women had sexual contact with the victim and failed to explain that the sexual assault kit ruled out sexual assault and/or a liaison." He complains that during opening statements the prosecutor referred to a piece of Walden's clothing as a "wife-beater" shirt. He also cites Jeffries's testimony relaying Walden's statement he rented Snyder's apartment to sleep with a woman and was sweating as though he had just "been with a woman."

Central to his claim, Walden argues "the introduction of the sexual assault kit results was not only insufficient to cure the prejudice to the Defendant, it actually made the impermissible inference of sexual assault and/or liaison worse." He complains "the jury was left to possibly conclude that two people had a sexual

---

[5] The State does not contest error preservation on these claims. A review of the record shows no contemporaneous objections other than the motion for mistrial following Claudia's testimony. Generally, the defendant must object to the introduction of inadmissible evidence to preserve error. *State v. Frazier*, 559 N.W.2d 34, 39 (Iowa Ct. App. 1996). We will address the claims on appeal because the State does not challenge error preservation.

liaison" and this furthered the inference Walden assaulted Keenan during a sexual liaison.

The situation here is somewhat unusual—the court did not admonish the jury, strike the evidence, or give a curative instruction to lessen any prejudice from Claudia's mention of the rape kit. Instead it secured the State's agreement to offer evidence showing the rape kit testing was actually exculpatory to Walden. We have not found a similar situation arising in our case law. But we need not address whether the court's creative problem-solving was appropriate because we resolve the issue on the prejudice ground.

At bottom, it is not critical to decide if the encounter between Walden and Keenan was sexual in nature. Even if the State offered evidence that cumulatively led to an inference the two had a sexual liaison, that fact does not require the jury to infer Walden killed Keenan with malice aforethought or specific intent.

As the district court noted, the rape-kit evidence did not support allegations of sexual abuse. The criminalist found no seminal fluid in Keenan's oral, rectal, or vaginal swabs. The blood under Keenan's fingernails was her own. And although a pubic comb showed a mix of hair, none was linked to Walden. The seminal fluid on the black sweatpants similarly did not contain Walden's DNA. So Claudia's mention of the rape kit, coupled with the court's prescribed cure of more evidence about the kit, did not prejudice Walden's defense.

Neither do we find Walden was unfairly prejudiced by other evidence suggesting he had sex with Keenan. The jurors could have drawn various inferences from Jeffries's testimony that Walden appeared sweaty and claimed to be renting the apartment to have sex with a woman. Given the absence of seminal

fluid in the rape kit, the jury could have viewed Walden's condition as pointing to strenuous physical activity consistent with cleaning up a crime scene.

Nor do we find prejudice arising from the prosecutor's use of the term "wife-beater" shirt[6] during opening statements to describe Walden's clothing at the time of the crime. The reference did not suggest sexual activity. And the prosecutor did not repeat that reference. Prejudice is less likely to flow from an isolated incident than "persistent efforts to place prejudicial evidence before the jury." *State v. Greene*, 592 N.W.2d 24, 32 (Iowa 1999). Here, Walden has failed to show this singular mention affected his case.

Overall, any hints of sexual conduct in the record pale in comparison to the medical evidence documenting the brutal assault on Keenan. Dr. Garrity described the blunt force trauma necessary to inflict the twenty-six wounds to her head and face. Walden has failed to show he suffered unfair prejudice from the remedy fashioned by the district court.

## B. Jury Instruction on Dangerous Weapon Inference

Walden next contends the district court erred in giving the jury the inference instruction on dangerous weapons. He argues insufficient evidence pointed to the existence of the murder weapon so the jury could not consider whether it was used in a manner indicating malice or intent to kill.

We review his claim for correction of errors at law. *See State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). "Evidence is substantial to support submission

---

[6] A "wife beater" shirt is a colloquial reference to a white tank top, which is not necessarily a comment on the wearer's propensity for domestic violence. *See State v. Condit*, No. 15-1547, 2007 WL 1342511, at *5 (Iowa Ct. App. May 9, 2007).

of an instruction to the jury when a reasonable mind would accept the evidence as adequate to reach a conclusion." *State v. Hogrefe*, 557 N.W.2d 871, 876 (Iowa 1996) (citation omitted). "In determining whether there is substantial evidence to support submission of an instruction to the jury, we view the evidence in the light most favorable to the party requesting the instruction." *Id.*

We start with the marshalling instruction. To find Walden guilty of murder in the first degree, the jury had to find:

> 1. On or about the 6th day of March, 2017, the defendant beat Sheila Keenan.
> 2. Sheila Keenan died as a result of being beaten.
> 3. The defendant acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Sheila Keenan.

The court's instructions also defined malice and malice aforethought:

> "Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another or in disregard of the rights of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.
>
> "Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

"Because it is a state of mind, malice aforethought often evades direct evidence." *State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010). But it "may be inferred by conduct." *Id.*

Our law recognizes such an inference when the defendant uses a "dangerous weapon." The court instructed Walden's jury the use of a dangerous weapon may support a finding of the requisite intent for murder:

> If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation and specific intent to kill.
> Malice aforethought may be inferred from the defendant's use of a dangerous weapon.

The court defined a dangerous weapon as

> any device or instrument designed primarily for use in inflicting death or injury, and when used in its designed manner is capable of inflicting death. It is also any sort of instrument or device which is actually used in such a way as to indicate the user intended to inflict death or serious injury, and when so used is capable of inflicting death.

In response to Walden's motion for judgment of acquittal, the State argued the jurors could decide from the nature of the victim's injuries that Walden used an instrument of some kind to inflict death. But the State conceded it was unable to produce that instrument. On appeal Walden renews his argument that the jury could not be instructed about a dangerous weapon in the absence of any evidence linking the victim's injuries to specific instrument.

Our supreme court discussed the dangerous weapon inference instruction in *State v. Green*:

> By instructing the jury that it may infer malice from the use of a dangerous weapon, courts present the jury with a straightforward example of how the State might prove the defendant's culpable state of mind. The inference, which the jury is permitted but never required to make, . . . exists because a rational juror could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill. If unjustified and unexcused, causing physical harm or death is a wrongful act, and therefore the intent to do these things is a state of mind that would constitute malice aforethought. Thus, the jury

may infer the defendant acted with malice aforethought by using a dangerous weapon, the natural consequence of which is physical harm or death.

896 N.W.2d 770, 780–81 (Iowa 2017). Trial courts have delivered that instruction with the supreme court's approval in cases where the defendants have fired a gun aimed at the victim, hit the victim in the head with a blunt object, stabbed a victim in the chest with a penknife, beaten a small child with hands and fists, and run over a victim with a car. *See id.* at 780 (collecting cases).

*Green* also discussed when it would be inappropriate to infer malice: if the defendant argues the weapon was not deadly or dangerous because death or bodily harm is not a foreseeable consequence of its use. *Id.* Or perhaps the weapon is deadly but the defendant asserts the use was not intentional, as in the accidental discharge of a firearm. *Id.* at 780–81. Or perhaps the inference of malice is inappropriate because the defendant used the dangerous weapon with justification or excuse. *Id.* at 781. None of these situations applies here. Walden focuses on the State's failure to offer evidence of a murder weapon or testimony that he used some undiscovered instrument.

We disagree with Walden's characterization of the record. Viewed in the light favorable to the State, the evidence allows us to infer the existence of a weapon wielded against Keenan. First, the medical examiner opined her injuries resulted from considerable force applied by some instrument. He described abraded lacerations as a crushing of the skin and underlying tissues and how "the instrument used" to inflict such injuries affects the wound. He described the hardness of the skull and maxilla bones and opined fractures to those bones required considerable force. He also described her compound injuries where the

assailant inflicted "multiple blows" in the same area. In explaining "blunt force" injuries versus "sharp force" injuries caused by a knife, the doctor explained breaking the skin would require "considerable force," implying an instrument different from a knife, but an instrument nonetheless. On top of this, the jurors were able to view photographs of Keenan's injuries and apply their common sense about their source. *See City of Cedar Rapids v. Bd. of Trs. of Mun. Fire & Police Ret. Sys.*, 572 N.W.2d 919, 926 (Iowa 1998) ("We do not ask juries to leave their experiences and common sense behind when deliberating.").

Walden argues the inference instruction was improper because it conflated the "level of injury" with the cause of death. That causation argument failed at trial. The district court considered whether Keenan could have incurred her injuries by striking her head and back against an object during a fall. The court rejected that possibility based on the nature of the injuries, their number, and severity. It defies common sense to infer these injuries were inflicted by a fall or any scenario other than multiple blunt force blows by a heavy instrument. The doctor's testimony presupposes the attacker used a blunt instrument to inflict those extensive injuries.

On top of Dr. Garrity's testimony on direct examination, on cross-examination the defense elicited further information about what "object" the attacker used. Dr. Garrity agreed it "would have been something of substance or thickness." We understand these questions sought to highlight the absence of a murder weapon. But the jury was free to infer the attacker used some object, though it was not recovered.

But did the unrecovered object constitute a dangerous weapon? Dangerous weapons are not limited to instruments designed or primarily used for

inflicting death or injury. As defined by the legislature, a "dangerous weapon" can be "*any* instrument or device" which has been used in such a way as to indicate the user intended it to cause death or serious injury and is capable of doing so. Iowa Code § 702.7. Here, the jury could conclude from the medical evidence that whatever instrument Walden wielded, he did so with the intent to cause serious injury or death. And the instrument did cause Keenan's death, because the force from its contact fractured her skull, which led to fatal brain hemorrhage and blood loss. Thus, the court properly instructed the jury.

## C. Sufficiency of the Evidence

Walden next challenges the sufficiency of the evidence supporting malice aforethought, premeditation, and specific intent, or that he used a dangerous weapon to justify an inference of those mental states. We review his challenge for correction of errors at law. *See State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). We will uphold a guilty verdict if it is supported by substantial evidence. *Id.* Substantial evidence exists when a rational trier of fact would be convinced the defendant is guilty beyond a reasonable doubt. *Id.* We view all relevant evidence in the light most favorable to the State. *Id.* Evidence is not substantial if it raises only suspicion, speculation, or conjecture. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). We make all legitimate inferences and presumptions that may reasonably be inferred from the evidence. *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005).

The district court did not err in denying Walden's motion for judgment of acquittal. The inference instruction provided the jury *may* infer malice from the use of a dangerous weapon, but it was not required to do so. Here, the many grave

injuries to Keenan's head supported the jury's finding of malice. *See State v. Rhode*, 503 N.W.2d 27, 39 (Iowa Ct. App. 1993) (allowing inference of malice from defendant intentionally slamming victim's head against hard surface causing severe injury).

In addition, Walden told Snyder that he "had to knock her out because she was in his pockets." Malice may be inferred from prior contentious dealings with the victim. *See id.* Plus, the nature and extent of the injuries show Walden had the opportunity to deliberate. Substantial evidence supports Walden acted willfully, deliberately, premeditatedly, and with a specific intent to kill Keenan even without the dangerous weapon inference. Taking the evidence in the light most favorable to the State and making reasonable inferences, we conclude the court did not err in denying the motion for judgment of acquittal.

### D. Weight of the Evidence

In his motion for new trial, Walden renewed his objection to the dangerous weapon jury instruction. On appeal, he contends the district court erred in denying his motion because the verdict was contrary to the weight of evidence.

Under Iowa Rule of Criminal Procedure 2.24(2)(b)(6), Walden may seek a new trial if the verdict is "contrary to law or evidence." The rule means "contrary to the weight of the evidence." *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). Where the evidence "preponderates heavily" against the verdict, the district court should grant a new trial based on the weight of the evidence to avoid a miscarriage of justice. *Id.* at 658–59. The weight-of-the-evidence standard requires the district court to independently "weigh the evidence and consider the credibility of witnesses." *Id.* at 658. But, on appellate review, we do not reweigh the evidence

or judge the credibility of the witnesses in our consideration of the denial of a motion for new trial. *State v. Reeves*, 670 N.W.2d 199, 202–23 (Iowa 2003). Our review is limited to the exercise of discretion by the trial court. *Id.* To prevail, the moving party "must show that the district court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* at 202.

As we explained above, the court properly instructed on the dangerous-weapon inference, even though the State did not produce a murder weapon. Our review is limited to the court's exercise of its discretion. We find no abuse of that discretion. These facts do not present the rare case for which a new trial is necessary because the evidence preponderates heavily against the verdict.

### E. Ineffective Assistance of Counsel

Finally, Walden raises a claim of ineffective assistance of counsel.[7] "Ineffective-assistance-of-counsel claims are an exception to the traditional error-preservation rules." *State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010). To prevail, Walden must show by a preponderance of the evidence counsel breached an essential duty and prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We often preserve ineffective-assistance claims for PCR actions. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). Preservation is preferred when the challenged action by counsel may implicate trial tactics. *Id.* If the claim is

---

[7] The Iowa legislature amended Iowa Code sections 814.6 and 814.7, effective July 1, 2019, limiting direct appeals from guilty pleas and eliminating direct-appeal ineffective-assistance-of-counsel claims. 2019 Iowa Acts ch. 140, §§ 28, 31 (codified at Iowa Code §§ 814.6–.7). The amendments "apply only prospectively and do not apply to cases pending on July 1, 2019," so they do not apply in this case. *State v. Macke*, 933 N.W.2d 226, 235 (Iowa 2019).

undeveloped, our court does not entertain it, but does not "outright reject it" either. *State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018).

Walden contends his trial counsel was ineffective in asking Dr. Garrity about the murder weapon on cross-examination and eliciting what he regards as the "sole evidence of use of a dangerous weapon." Whether counsel made a tactical choice to broach this topic and whether he was acting as competent counsel is best left to a court with a fully developed record. We preserve Walden's ineffective-assistance-of-counsel claim for possible PCR proceedings.

**AFFIRMED.**